400

PARTIDO SOCIALISTA PUERTORRIQUEÑO, recurrente, *v.* COMISIÓN ESTATAL DE ELECCIONES y ADMINISTRADOR GENERAL DE ELECCIONES, recurridos; PARTIDO POPULAR DEMOCRÁTICO, recurrente, *v.* COMISIÓN ESTATAL DE ELECCIONES y ADMINISTRADOR GENERAL DE ELECCIONES, recurridos; PARTIDO SOCIALISTA PUERTORRIQUEÑO, interventor-recurrente, PARTIDO NUEVO PROGRESISTA, recurrido, *v.* COMISIÓN ESTATAL DE ELECCIONES y ADMINISTRADOR GENERAL DE ELECCIONES; PARTIDO POPULAR DEMOCRÁTICO, interventor-recurrente, *v.* COMISIÓN ESTATAL DE ELECCIONES y ADMINISTRADOR GENERAL DE ELECCIONES; PARTIDO POPULAR DEMOCRÁTICO, interventor-recurrente, LUIS A. FERRÉ, ORESTE RAMOS y OTROS, recurridos, *v.* COMISIÓN ESTATAL DE ELECCIONES y ADMINISTRADOR GENERAL DE ELECCIONES; PARTIDO SOCIALISTA PUERTORRIQUEÑO, interventor-recurrente, LUIS A. FERRÉ, ORESTE RAMOS y OTROS, recurridos, *v.* COMISIÓN ESTATAL DE ELECCIONES y ADMINISTRADOR GENERAL DE ELECCIONES.

*Números:* O-80-635, *Resueltos:* 2 de diciembre de 1980
O-80-646,
O-80-645,
O-80-647,
O-80-658,
O-80-664

402

*Ludmilia Rivera Burgos, Juan Mari Bras, Carlos Gallisá y Raúl Olmo,* abogados del Partido Socialista Puertorriqueño; *Miguel A. Pagán, Eunice Sein Llompart y José A. Carlo,* abogados del Administrador General de Elecciones; *Héctor Reichard, Jr., Oreste Ramos, Virgilio Ramos, Benny F. Cerezo y Héctor Laffitte,* abogados del Partido Nuevo Progresista; *Guillermo Mojica Maldonado, Pedro Ortiz Álvarez, José A. Andreu García, Miguel E. Andreu García y Miguel D. Lausell,* abogados del Partido Popular Democrático.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

## I

## *PRINCIPIOS PRELIMINARES*

La fiel solución de las distintas controversias planteadas en los recursos de epígrafe([1]) requiere una breve referencia a varios principios comunes electorales de índole constitucionales, estatutarios y administrativos, que sirven de trasfondo conceptual a los planteamientos y derechos reclamados.

---

([1]) Para una más pronta disposición, los hemos consolidado. En aras de una mejor exposición, los recursos no siguen estrictamente el orden de radicación, sino un orden elaborado a base de asuntos.

También el examen, aunque someramente, de la estructura organizacional y de ciertos postulados de importancia en que se inspira, apuntala y desarrolla la dinámica del sufragio bajo la vigente Ley Electoral de Puerto Rico —Núm. 4 de 20 de diciembre de 1977, según enmendada— 16 L.P.R.A. sec. 3001 *et seq.*

La Constitución del Estado Libre Asociado de Puerto Rico, en su Art. II, Sec. 2, reconoce expresamente el derecho al "sufragio universal, igual, directo y secreto . . .". Marca así la huella indeleble del postulado mayor plasmado en el Preámbulo, que enfatiza el carácter democrático de nuestra sociedad donde el poder político emana del Pueblo y se ejerce con arreglo a la voluntad manifiesta en las urnas. Complementan este mandato las disposiciones sobre igual protección de las leyes y la salvaguarda contra el discrimen por razones políticas. También es de linaje constitucional la amplia facultad que posee la Asamblea Legislativa para regular el proceso electoral. ([2])

Dentro de ese margen hemos reconocido como objetivos lícitos y apremiantes toda reglamentación que, sin obstaculizar innecesariamente el voto, propenda a la realización de

---

([2]) *Diario de Sesiones de la Convención Constituyente*, ed. 1961, T. 2, págs. 1402–1403; T. 3, pág. 2074; T. 4, pág. 2621.

El Art. VI, Sec. 4, reza:

"Las elecciones generales se celebrarán cada cuatro años en el día del mes de noviembre que determine la Asamblea Legislativa. En dichas elecciones serán elegidos el Gobernador, los miembros de la Asamblea Legislativa y los demás funcionarios cuya elección en esa fecha se disponga por ley.

"Será elector toda persona que haya cumplido dieciocho años de edad, y reúna los demás requisitos que se determine por ley. Nadie será privado del derecho al voto por no saber leer o escribir o por no poseer propiedad.

"*Se dispondrá por ley todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas.*

"Todo funcionario de elección popular será elegido por voto directo y se declarará electo aquel candidato para un cargo que *obtenga un número mayor de votos que el obtenido por cualquiera de los demás candidatos para el mismo cargo.*" (Bastardillas nuestras.)

un proceso electoral justo, ordenado, libre de fraude, honesto e íntegro. *P.S.P., P.P.D. y P.I.P.* v. *Romero Barceló*, 110 D.P.R. 248 (1980); *P.N.P.* v. *Tribunal Electoral*, 104 D.P.R. 741 (1976). En la consecución de estos derroteros, el establecimiento de normas y reglas uniformes que propicien la estabilidad, confianza y certeza en cuanto a la adjudicación correcta de toda papeleta es esencial. *P.P.D.* v. *Barreto Pérez*, 110 D.P.R. 376 (1980). Ni la potestad legislativa de reglamentar como tampoco el derecho al sufragio pueden operar bajo un esquema de disposiciones legislativas arbitrarias o en irrestringidos reclamos de electores; no son valores que se implementan en términos absolutos.

La Ley Electoral aprobada en 1977 crea un organismo denominado Comisión Estatal de Elecciones, cuya estructura básica administrativa y decisional responde a una visión de un sistema electoral político contencioso[3] en que se detectan tres notas sobresalientes: (1) impone a los partidos políticos la responsabilidad de estructurar e inspeccionar todos los procedimientos de naturaleza electoral a regir en los procesos eleccionarios; (2) que la formulación e implementación de ese mandato se logren mediante el consenso unánime de los partidos; y (3) que de ese proceso se ejerza la mutua fiscalización partidista.

Nuestra Constitución y la Ley Electoral admiten que la participación de los partidos políticos es esencial para el sistema democrático. Sin ella, difícilmente se podría poner en marcha en una elección el aparato oficial gubernamental. Como dijimos en *Dávila* v. *Secretario de Estado*, 83 D.P.R. 186, 193–194 (1960):

Comenta Bruce que una de las lecciones severas a ser aprendidas en una democracia es que ningún mecanismo automático, mucho menos constituciones, cartas orgánicas y leyes pueden asegurar permanentemente la eficiencia y efectividad del gobierno

---

[3] R. Schmidt Monge, *Notas sobre Derecho Electoral Puertorriqueño*, Rev. C. Abo., Vol. 40, Núm. 4, págs. 535, 541 (1979)

por el pueblo. Para éste, muchas fuerzas deben ponerse en movimiento fuera de la estructura constitucional para efectuar la vital conexión entre el pueblo y sus organismos gobernantes. Es a través de partidos políticos que no solamente la opinión pública se traduce en acción, sino que un continuo enlace entre las autoridades gobernantes y los componentes del estado se mantiene. Los partidos siempre han estado fuera de la estructura del gobierno, sin embargo ellos han constituido su sangre, su carne y su sistema nervioso. Aparte de una conciencia pública sana y activa, aparte de la educación moral y política de un pueblo, aparte de los vehículos de publicidad, —prensa, radio, las plataformas,— que se combinan para mantener al pueblo unido e informado, un hecho se ha reconocido desde el principio como absolutamente esencial a una democracia eficiente: el partido político moderno.

Ahora bien, aun lo enorme de su importancia no desvirtúa el hecho de que los partidos políticos constituyen un medio y no un fin. El sujeto principal de la arquitectura moderna constitucional-electoral tutelado es el elector individual. El partido no es el elemento ultimador, sino un vehículo de expresión individual que se suma a otros para resultar y viabilizar la expresión colectiva ciudadana. Así, toda ley de actualidad regulatoria de la franquicia electoral se ha encaminado hacia el reconocimiento de la "prevalencia de los derechos electorales del ciudadano *sobre los derechos* y prerrogativas de *todos* los partidos y agrupaciones políticas". (Bastardillas nuestras.) Art. 2.001(11) (16 L.P.R.A. sec. 3051(11)). Al final de cuentas, este derecho individual es el verdadero destinatario y receptor del sistema, por lo cual es de incuestionable interés público salvaguardarlo contra las posibles injusticias que de vez en cuando el choque de intereses de los partidos puede generar.

■ A tal efecto, como custodio y representante del interés individual y público —frente al netamente político partidista—, el legislador crea el cargo de Administrador General de Elecciones nombrado por el Gobernador de una lista sometida por unas Juntas Consultivas de Nombramientos, con el

consejo y consentimiento del Senado y quien preside la Comisión Estatal de Elecciones. Ese funcionario es "responsable al Pueblo de Puerto Rico por la implementación y dirección de los procesos electorales dentro de un ambiente de absoluta pureza e imparcialidad . . .". En la consecución de esa tarea posee "los poderes, atribuciones y prerrogativas *inherentes* al cargo", entre los que se destacan: (1) "planificar, dirigir y supervisar todos los procesos electorales celebrados" conforme la ley y reglamentos; (2) "seleccionar, reclutar y nombrar el personal" necesarios para llevar a cabo los propósitos de la ley, incluso reclutar o contratar vigilantes o guardias especiales en el día de una elección; y (3) "realizar todos aquellos otros actos necesarios y convenientes para la implementación" de la ley. (Bastardillas nuestras.) Art. 1.007, incisos (a), (b) y (m); 16 L.P.R.A. sec. 3007(a), (b) y (m). Conjuntamente con dicho funcionario, la Comisión Estatal de Elecciones —integrada por Comisionados Electorales y sus alternos nombrados por el Gobernador a petición del organismo central de cada partido político— es "el organismo responsable de estructurar e inspeccionar todos los procedimientos de *naturaleza electoral*", conforme la ley y sus reglamentos. (Bastardillas nuestras.) Entre sus labores figuran "diseñar un plan integral dirigido a una mayor eficiencia, rapidez y resolución de todos los problemas, asuntos y procedimientos electorales"; atender, investigar y *resolver* originalmente asuntos de su competencia; y aprobar y adoptar las reglas y los reglamentos necesarios. En resumen, la Comisión tiene funciones administrativas, cuasi legislativas y cuasi judiciales. Arts. 1.012 y 1.013 (16 L.P.R.A. secs. 3012 y 3013).

La fórmula y mecánica de votación prescrita en la ley remite inicialmente las decisiones de la Comisión al criterio unánime de los votos de los Comisionados Electorales presentes. De no mediar tal unanimidad, la cuestión "será *decidida*, en pro o en contra por el Administrador . . . cuya *decisión* se considerará como la decisión de la Comisión" y podrá ape-

larse. (Bastardillas nuestras.) Art. 1.014(e), 16 L.P.R.A. sec. 3014(e). Esa apelación se interpondrá ante la Junta Revisora Electoral, compuesta por tres miembros, de cuyo cuerpo se puede intentar una revisión ante este Tribunal Supremo. Arts. 1.023 y 1.024 (16 L.P.R.A. secs. 3023 y 3024). Fácil es advertir la extensa facultad y delicada responsabilidad que recae sobre los hombros del Administrador General como *única* figura clave representativa del interés público en la Comisión. La importancia de que decida con recta ecuanimidad, imparcialidad y juridicidad se acentúa por el ambiente inherentemente político en que se asumen y adoptan posiciones sobre algunas cuestiones de importancia e impacto partidista, y en las cuales resulta natural e inevitable que el voto individual de los Comisionados responda exclusivamente a razones y consideraciones de ventajas partidistas.(⁴)

Por su naturaleza, a la Comisión le aplican, pues, normas vigentes elementales en derecho administrativo, tales como que un reglamento promulgado para implementar la ejecución de una ley puede complementarla, pero no estar en conflicto con ésta, *Ex Parte Irizarry*, 66 D.P.R. 672 (1946); que a menos que se trate de una reglamentación nula per se, los reglamentos crean un estado de derecho que protege a los que actúan bajo sus disposiciones, *Aparicio v. Peñagarícano, Admor.*, 84 D.P.R. 401 (1962); y que un reglamento o actuación administrativa claramente en conflicto o en contra de la ley es nulo, *Infante v. Tribl. Examinador Médicos*, 84 D.P.R. 308 (1961).

Bajo la filosofía y estructura creadas en la ley, los partidos políticos no sólo están representados en la Comisión,

---

(⁴)Los alegatos en los recursos ante nuestra consideración ilustran esta proposición. Así, advertimos que según la ganancia electoral que mediante determinado señalamiento de error e interpretación se puede lograr, los partidos políticos comparecientes nos proponen, sin reparo alguno en posiciones antagónicas e inconsistentes adoptadas en otros escritos, un enfoque restrictivo o liberal, la aplicación o no de la doctrina de incuria (*laches*), y otros.

sino que ejercen un control efectivo primario del sistema electoral. Se visualiza al Comisionado Electoral como la persona que sirve los intereses de su partido y de enlace entre esa agrupación, el Administrador y los electores. A tono con ese diseño, hace tiempo reconocimos que la presencia con voz y voto de un representante de cada partido político, es "una cuestión de juego limpio o como una garantía adicional de una elección honrada e imparcial . . .". *Martínez* v. *Junta Insular de Elecciones*, 43 D.P.R. 413, 417 (1932). Así concebida la función, por regla general, entonces, un Comisionado no puede desentenderse y hacer caso omiso de los acuerdos y reglas válidas adoptadas previamente por unanimidad. Claro está, ello no le impide que a base de discrepancias *bona fide* sobre la interpretación o alcance de una regla o acuerdo así aprobado, plantee en ese limitado contexto el asunto ante la Comisión, para que se actúe afirmativamente. Sin embargo, ha de tenerse presente que, para evaluar los requisitos electorales fijados a los partidos políticos, "la misma vara de medir debe usarse en ambos casos". *Martínez* v. *Junta Insular de Elecciones*, 43 D.P.R. 413, 422 (1932).

Tomando en cuenta los propósitos expuestos, examinemos los distintos planteamientos de las partes.

## II

*RECURSOS*

> O-80-645, *Partido Socialista Puertorriqueño* v. *Partido Nuevo Progresista y Junta Revisora Electoral;* O-80-647, *Partido Nuevo Progresista* v. *Barreto Pérez, Administrador, y Comisión Estatal de Elecciones*

A. *Fórmula de Votación y Decisión de la Comisión*

Concentramos nuestra atención en el señalamiento de que la Junta Revisora Electoral erró al anular limitadamente la Regla 60 del Reglamento de la Comisión, (⁵) que disponía que

---

(⁵) En lo pertinente reza:

"Manera de Resolver Controversias de Adjudicación de Papeletas Du-

las papeletas fueran adjudicadas por mayoría de los Comisionados "sin contar con el voto del Administrador", quien sólo decidiría en caso de empate.

■ El argumento principal para sostener este planteamiento de error lo formula el P.S.P. atacando la raíz que sostiene el razonamiento de la Junta, alegando que la fórmula y mecánica de votación del Art. 1.014 (e), 16 L.P.R.A. sec. 3014 (e), es inconstitucional. Nos expone:

Dicho artículo viola la igual protección de las leyes, Artículo 2, sección 1, *Constitución del Estado Libre Asociado* y los principios básicos de un sistema democrático, *Preámbulo Constitución del Estado Libre Asociado,* al darle mayor peso a una minoría de dos frente a una mayoría de tres. Este Artículo establece que en casos en que haya una disidencia entre los cuatro Comisionados, entonces el Administrador decidirá con su voto. Esto hace que aún con la oposición de tres partidos se apruebe una determinación por el disidente y el Administrador. En procesos como el que está sometida la Comisión en estos momentos, este Artículo le da prácticamente un poder de veto al Administrador ya que por lo general en este tipo de procesos de adjudicar votos, por lo menos hay un disidente. Este Artículo le niega igual peso a cada Partido en la toma de decisiones planteando la situación anómala de que dos sean mayor que tres, lesionando el principio democrático del acatamiento de la decisión hecha por las mayorías.

---

rante el Escrutinio General:

"
. . . . . . .

"El Secretario Estatal de Elecciones o su Representante entregará diariamente las papeletas en controversia a la Comisión constituida por los Comisionados Electorales de los Partidos Políticos. La Comisión celebrará todos los días que dure el escrutinio sesiones de adjudicación inmediatamente después de terminado el escrutinio del día. Si resultare imposible por justa causa, celebrar una sesión de adjudicaciones algún día del escrutinio, se celebrará dicha sesión de adjudicaciones el día siguiente a las nueve (9:00) de la mañana. Cualquier duda al proceso de Escrutinio General y a la adjudicación de papeletas en el mismo, o cualquier duda sobre estos extremos, podrán ser formulados por los Representantes en las mesas de los Partidos Políticos y del Administrador y serán adjudicados en primera instancia por la Comisión *por mayoría de votos sin contar con el voto del Administrador*. En caso de empate el Administrador decidirá, pero su decisión podrá ser apelable a la Junta Revisora Electoral." (Bastardillas nuestras.)

El principio de un hombre un voto que permea nuestro ordenamiento político de democracia representativa y el principio de que el poder descansa en las mayorías, a nuestro entender tiene plena vigencia al aplicarse en la toma de decisiones de un proceso electoral donde los electores son representados por los distintos Partidos Políticos. Las decisiones colectivas que se hacen a través del proceso electoral tienen como instrumento los partidos políticos. Por tal razón, la Ley debe poner en igualdad de condiciones a los instrumentos de canalización de las decisiones colectivas para poder cumplir con la garantía de libre participación y de reconocimiento de los derechos del hombre.

El Administrador General de Elecciones es nombrado por el Gobernador de Puerto Rico quien a su vez es el Presidente del Partido mayoritario. El peso tan grande que le da la Ley en el Artículo 1.014 (E) a la intervención de este funcionario a nuestro entender, afecta el libre juego democrático y el balance que debe existir en un proceso electoral donde los Partidos Políticos deben tener igual peso en la toma de decisiones sin verse afectados por la intervención gubernamental.

El método decisional resiste el ataque de inconstitucionalidad. Nos explicamos. Al describir previamente la filosofía y estructura de la Comisión Estatal de Elecciones, destacamos que sus integrantes son los representantes de los distintos partidos políticos. Tal composición parte del supuesto de que esos Comisionados Electorales se fiscalizarán recíprocamente y, como resultado, se lograrán unas elecciones justas, limpias y ordenadas. También hemos señalado que las únicas limitaciones que pesan sobre un acuerdo unánime de los Comisionados Electorales son las dimanantes de la Constitución, o de la Ley, o de un reglamento previamente aprobado. Incuestionablemente, la concepción legislativa en la mecánica de votación tiene sus virtudes al igual que defectos. Teóricamente propicia que los partidos políticos, como contendientes institucionales primarios, para beneficio de sus seguidores —y, por ende, de todos los electores— establezcan por mutuo acuerdo, en igualdad de condiciones, las normas y reglamentos requeridos para todo evento electoral. A su vez, ello tiende a evitar planteamientos de sorpresa, cambios posteriores para

obtener ventajas, asegurando la estabilidad, certeza y pulcritud comicial. Por otro lado, se pueden agudizar y perpetuar *ad infinitum* las discrepancias entre tales partidos, sean originadas en el seno de la Comisión o transportadas de afuera hacia adentro. En esta última situación es que se evidencia la razonabilidad de la ley.

Al examinar detenidamente el marco conceptual que inspira el estatuto, vemos que la mecánica decisional de la Comisión se compone de dos etapas. La *primera,* que las cuestiones y las decisiones de la Comisión corresponde inicialmente dilucidarlas y adoptarlas a los Comisionados Electorales, por votación unánime. La ley favorece y estimula tales acuerdos. Así, si hay unanimidad, el acuerdo institucional y colegiado es la decisión válida de la Comisión y sólo resta implementarlo. En esa etapa, solamente los Comisionados votan sin que intervenga el Administrador. Ahora bien, si no existe tal unanimidad, legalmente no hay decisión y se pone en movimiento la *segunda* etapa. Para ésta, la ley entonces contempla y confiere al Administrador la facultad de decidir. Esa decisión no es propiamente hablando un simple voto adicional que se suma matemáticamente a los de algunos Comisionados, sino la decisión institucional, ipso jure, de la Comisión. La ley les dio la oportunidad a los Comisionados de decidir y, al no poder hacerlo por unanimidad, no se materializa ni existe decisión. Cesa ahí el poder de los Comisionados. Entonces se otorga al Administrador la prerrogativa de decidir exclusivamente la cual se produce con efecto institucional. Notamos, pues, que en su sentido más preciso, no podemos estrictamente hablar de un sistema de votación en que se vulnera la regla de la mayoría. El desenvolvimiento de la ley opera en dos etapas definidas y no por votación mayoritaria. Pudo muy bien la Asamblea Legislativa conceder poderes de decisión en toda etapa exclusivamente al Administrador, ciñendo la ingerencia de los partidos políticos a simples órganos de consulta, y ello no vulneraría la Constitución.

Ahora bien, podría argüirse que el análisis del sistema de votación antes descrito es más bien un refinamiento conceptual, el cual inevitablemente en la práctica —se caracterice como voto o decisión— la intervención y decisión del Administrador esencialmente implica que por ficción de ley lo que es el sentir de la minoría se puede convertir en mayoría. Aun así subsistiría su constitucionalidad. Veamos.

Bajo cualquier lupa es innegable que el patrón de votación está plasmado legislativamente en *dos* etapas. Si observamos bien, advertimos que ese modelo se extiende al resto de la estructura electoral. Así, las Comisiones Locales de Elecciones, de carácter permanente en cada precinto electoral, están integradas por un miembro de la Judicatura como Presidente —designado por el Juez Presidente— y representantes de cada partido político. Sus acuerdos deberán ser aprobados por *unanimidad* y en caso contrario la cuestión será decidida en pro o en contra por el Presidente de la misma. Esta es la única ocasión y circunstancia en que dicho Presidente podrá votar. (Bastardillas nuestras.) Art. 1.030 (16 L.P.R.A. sec. 3030). Esta decisión podrá ser apelada a la Comisión Estatal.

De igual modo también sucede respecto a las Juntas de Colegio Electoral en funciones el día de elecciones. Al realizar el escrutinio y adjudicación de papeletas, deben hacerlo por unanimidad de sus inspectores, que a su vez son representantes de cada partido político. Art. 6.002 (16 L.P.R.A. sec. 3262).

Si partimos de la hipótesis estatutaria antes indicada de que el Administrador representa el interés público —en contraste con los Comisionados, que abogan por el de sus respectivos partidos— es razonable concluir, al igual que lo hizo la Junta Revisora, que "[l]a Regla 60 es inválida en cuanto establece que los acuerdos serán por mayoría y excluye el voto del Administrador, excepto en el caso en que la decisión sea empate. Entendemos y resolvemos que la parte del Reglamento que altera la forma de votar de la Comisión provista en

la ley es nula y debe tenerse por no puesta. La disposición de ley es sabia y evita que varios Comisionados se pongan de acuerdo para eliminar el poder decisional del Administrador, único funcionario que no representa un interés partidista en la Comisión Estatal de Elecciones y sí el interés público. El Administrador no podrá desempeñar su función si su intervención queda a merced de la mayoría de los partidos políticos".

No es necesaria una elaboración exhaustiva para comprender que el interés del Estado en que el proceso electoral no quede en manos exclusivas de los intereses de los partidos políticos —con las pasiones, desavenencias y problemas que ello a veces acarrea— es de suficiente valía como para mitigar y derrotar el reclamo a base de la tesis de una fórmula de votación estrictamente basada en una mayoría númerica simple. (6) A ello responde la posición y facultad de decisión del Administrador.

■ La exposición que antecede en torno a la estructura que permea la Ley Electoral —composición y criterio de votación, unanimidad— pone de manifiesto la nulidad de la Regla 60, en cuanto a que la adjudicación de papeletas por la Comisión sería por mayoría de votos "sin contar con el voto del Administrador". Resulta incompatible y contraria a la ley y no puede prevalecer. Debe estimarse enmendada a los efectos de que el Administrador intervenga y decida, de ser necesario. *Fue correcta en este sentido la determinación de la Junta Revisora Electoral.*

---

(6) Adviértase, además, instancias en que el criterio de decisión de "simple mayoría" no es absoluto. La propia Constitución impone sobre este Tribunal una restricción a la facultad de decretar la inconstitucionalidad de estatutos a base de la mayoría absoluta de sus miembros. Art. V, Sec. 4. La facultad del veto del Poder Ejecutivo sobre el Legislativo, aunque temporalmente, constituye otro ejemplo en que el criterio rector de mayoría está subordinado al de una sola persona. Art. IV, Sec. 4. La Asamblea Legislativa, en lo concerniente a la expulsión de sus miembros y el poder de residenciamiento son muestras adicionales de que la simple mayoría no es criterio decisivo. Art. III, Secs. 9 y 21.

## B. *Regla 60 de la Comisión*

Ahora bien, no está del todo claro el alcance de la resolución de la Junta Revisora sobre la facultad del Administrador y la Comisión para delegar sus funciones adjudicativas. Dicho foro apelativo dispuso que la Comisión Estatal de Elecciones interviniera en su capacidad de cuerpo colegiado con las papeletas recusadas a base de una interpretación literal del Art. 6.003 que reza:

> Si posteriormente a una elección se demostrare que una papeleta recusada fue votada por una persona o elector sin derecho a votar en ella, la *Comisión* ordenará la anulación de su voto así como la rectificación del escrutinio. (Bastardillas nuestras.) (16 L.P.R.A. sec. 3263.)

Razones fundadas en consideraciones prácticas y jurídicas nos mueven a esclarecer esa interpretación textual. Levantaría serios obstáculos a las medidas adoptadas para propiciar y lograr la pronta terminación del escrutinio general papeleta por papeleta. En *P.P.D.* v. *Barreto Pérez*, supra, reconocimos las facultades de la Comisión Electoral para descargar eficientemente su encomienda "de estructurar e inspeccionar todos los procedimientos de naturaleza electoral" necesarios y congruentes con la propia ley. (Escolio 4.) Allí aprobamos con beneplácito varios acuerdos adoptados para implementar y expeditar el escrutinio general papeleta por papeleta, destacándose el establecimiento de sesenta (60) mesas de escrutinio. Estas mesas de escrutinio se desempeñan siguiendo las instrucciones y criterios de adjudicación previamente fijados por la Comisión mediante acuerdos, lo cual es perfectamente lícito. Conforme ese plan, cuando los funcionarios de una mesa no logran ponerse de acuerdo para adjudicar un voto, esa papeleta controversial es referida a una "mesa de escrutinio especial" integrada por funcionarios versados y experimentados en la materia. Si ellos tampoco logran conformidad para adjudicarla, entonces la papeleta pasa a la consideración de la Comisión Estatal en pleno. El Reglamento para las Elec-

ciones Generales de 1980 crea los mecanismos apropiados para dicha tarea. Específicamente la Regla 57 dispone que la mesa de escrutinio general "estará compuesta por un funcionario en representación del Administrador, el cual será un empleado de la Comisión Estatal de Elecciones, y un representante por cada uno de los Partidos Políticos". Y la Regla 58 preceptúa —siguiendo parcialmente *verbatim* el lenguaje del Art. 6.008 de la Ley— que "[l]a Comisión Estatal de Elecciones practicará *en la mesa del escrutinio general* el mismo, interviniendo con las 'Papeletas No Adjudicadas' y las 'Protestadas' y, *contará o rechazará* éstas según lo que a su juicio se requiera por ley". (Bastardillas nuestras.)

Si la Comisión no pudiera delegar sus funciones —sujeto a criterios predeterminados— nunca podría realizarlas y culminarlas. Constantemente el estatuto le impone un sinnúmero de deberes —tanto ministeriales como cuasi legislativos y adjudicativos— que necesariamente han de delegarse, si se pretende que en un período de tiempo razonable dicho organismo cumpla con su encomienda cardinal de certificar en tiempo los candidatos electos. El que la Comisión haya ordenado sus labores a base de la "mesa de escrutinio especial" para toda la isla o una por cada precinto, no desnaturaliza el carácter institucional adjudicativo de la decisión. A manera de analogía, tampoco sufre merma institucional la adjudicación de casos, cuando los tribunales utilizan Comisionados. Lo importante es que el producto final sea depurado y rubricado por la autoridad final correspondiente. Como dijimos en *A.D.C.V.P.* v. *Tribunal Superior*, 101 D.P.R. 875, 883 (1974), se puede llegar a esta etapa y a una "decisión informada, con conocimiento y comprensión de la evidencia ofrecida, sin que importe al caso el medio o mecanismo por el que esa inteligencia de la cuestión debatida llegue a su poder, que puede fluir cuando el comisionado no participa en las vistas, por lectura de la transcripción de evidencia oral y examen de la documental; o informe, resumen, compendio, escrito u oral,

o pliego de determinaciones de hechos sometidos por los Examinadores a los comisionados".

■ Bajo esa perspectiva se observa la validez de la mecánica de la Regla 60, excepto en la medida dispuesta para una votación que no sea por unanimidad. Nótese que la Regla requiere que se levante un acta cuando los representantes de los partidos en la mesa de escrutinio y el representante del Administrador no pueden convenir sobre la adjudicación o validez de una papeleta. Esa acta contendrá: una breve exposición de lo que origina la controversia, las posiciones respectivas de las partes, identificación del colegio y recinto, y cualquier incidente surgido respecto a su adjudicación o rechazo. Contiene suficientes elementos de juicio para que la Comisión, de ser necesario, proceda a adjudicar las papeletas en controversia, al amparo del Art. 6.008. [7]

## C. *Voto de los Guardias Especiales*

La pulcritud del proceso electoral, el orden, su estabilidad y control son intereses gubernamentales apremiantes que sostienen la validez de la premisa estatutaria: que, como regla general, todo elector ejerza el sufragio en el colegio [8] o unidad electoral de su precinto en que figura inscrito. Arts. 2.002 y 5.029 (16 L.P.R.A. secs. 3052 y 3229). Sería casi imposible planificar y realizar unas elecciones, y contabilizar sus resultados, si el proceso se dejara en manos de los cientos de miles de electores que participan en las mismas. Sobrevendría el caos y no se podría verificar la idoneidad del elector,

---

[7] Otra interpretación no sólo propiciaría que el recuento general papeleta por papeleta pudiera extenderse por un período de tiempo constitucionalmente irrazonable, sino que, bajo ese mismo fundamento, obligaría a los miembros de la Comisión a contar ellos personalmente cada papeleta y a realizar las operaciones matemáticas que exige la ley en distintas fases.

[8] El Art. 1.003(8) define *Colegio de Votación* como "el lugar o sitio donde *votarán* los electores que figuren en la lista final de electores de determinada unidad electoral". (Bastardillas nuestras.) (16 L.P.R.A. sec. 3003(8).)

si cada uno pudiera votar en el colegio de su preferencia y no en el asignado previamente y en el cual aparece en la lista.

No obstante, la Asamblea Legislativa, para viabilizar el voto de aquellas personas que debido a diversas razones no pueden comparecer al colegio electoral en que están inscritos, desde la promulgación original de la Ley Electoral fijó el procedimiento y voto de electores ausentes. Arts. 5.038 a 5.042 (16 L.P.R.A. secs. 3238 a 3242). Entre los funcionarios de gobierno a los que se les concede ese derecho están *los miembros de la Policía y Guardia Municipal,* los miembros de las Fuerzas Armadas y Guardia Nacional destacados en el exterior y los estudiantes y obreros migrantes que se encuentren fuera de Puerto Rico. Enmiendas introducidas en virtud de la Ley Núm. 3 de 8 de septiembre de 1980 extendió el voto ausente a los confinados en las instituciones penales, sus oficiales de custodia y a ciertos funcionarios y empleados electorales.

Esencialmente, el procedimiento exigía del elector interesado la realización de unos trámites y sobre éste recaía la responsabilidad de ejercitar su voto bajo esa opción. En particular, si el agente del orden público estatal o municipal no lo solicitaba en tiempo, bajo riesgo propio de no poder hacerlo, venía obligado a votar en el colegio en que aparecía inscrito.

Para la comprensión inteligente e integral de esta particular controversia, es necesario mencionar, además, varias disposiciones pertinentes. El Art. 5.027 (16 L.P.R.A. sec. 3227), impone a la Policía de Puerto Rico la obligación de proveer "personal *regular* suficiente para velar por el mantenimiento del orden en cada centro de colegios de votación" con la colaboración de la Guardia Municipal. (Bastardillas nuestras.) Hemos visto antes que ese mismo artículo, *in fine,* solamente autoriza al Administrador a "reclutar o contratar vigilantes o guardias especiales en el día de una elección o inscripción". Además, el Art. 5.036 (16 L.P.R.A. sec. 3236), permite a los funcionarios del Colegio Electoral, por razones

obvias basadas en sus funciones, emitir sus votos, aunque no aparezcan "sus nombres en la lista de votantes" del colegio en que trabajan, si son electores inscritos del precinto. En tal eventualidad se estiman recusados tales votos. Y finalmente, el Art. 5.020 (16 L.P.R.A. sec. 3220), declara incompatible el cargo de miembro de la Junta de Colegio con el de policía.

Recapitulando, la Ley Electoral, por razones poderosas establece, bajo pena de recusación que afecta la integridad del voto, que todo elector emita su voto en el Colegio en que está inscrito. Por excepción, algunos funcionarios pueden ejercer el denominado voto ausente. El Superintendente de la Policía *no* está autorizado por ley a reclutar o contratar guardias especiales para las elecciones, facultad que corresponde al Administrador General. Con esta perspectiva jurídica presente, veamos los hechos.

El 28 de marzo de 1980, mediante Resolución Conjunta Núm. 1705 del Senado, se asignaron a la Policía $700,000 para el pago de guardias especiales para las elecciones. Del texto de esa Resolución no se infiere, como tampoco se autoriza al Superintendente de la Policía a contratar o reclutar ese personal. En 27 de septiembre la Comisión Estatal acordó comunicarle por conducto del Administrador General al Superintendente de la Policía, como lo hizo el 29, "que entendía que no era necesario el reclutamiento de guardias especiales para las Elecciones Generales y que tampoco la Comisión estaría en posición de adoptar una resolución estableciendo voto preferente para dichos guardias especiales". El Superintendente contestó el 22 de octubre reiterando su criterio de que eran necesarias tales designaciones. La Comisión reafirmó su acuerdo, advirtiéndole que era *"imprescindible* que de reclutarse los guardias especiales, *se les asigne a la unidad electoral en la que corresponde votar en su precinto"*. (Bastardillas nuestras.)

Esos acuerdos preelectorales de la Comisión, al igual que el adoptado en 12 de noviembre de 1980 en el sentido de que

el "voto de guardias especiales votando fuera de su colegio será anulado", fueron por *unanimidad.*

El 14 de noviembre el Comisionado Electoral del Partido Nuevo Progresista solicitó, entre otras cosas, que se dejara sin efecto ese acuerdo. Con la decisión del Administrador en su contra, esa propuesta fue derrotada. Apeló ante la Junta Revisora, que lo anuló a base del siguiente fundamento:

Los guardias especiales ejercieron unas funciones similares a la policía estatal y la Comisión no dispuso ningún mecanismo para garantizar el derecho al voto de estos guardias y fue más lejos, *les permitió votar* para con posterioridad a las elecciones el 12 de noviembre de 1980 decidir que esos votos eran nulos. Entendemos que la Comisión actuó arbitrariamente al anular los votos de los guardias especiales, habiendo inducido y *permitido* que votaran donde estaban trabajando. Éstos naturalmente votaron bajo la impresión de que su voto sería adjudicado al no establecerse ningún otro mecanismo para garantizarles su derecho a votar.

Es importante que esta clase de funciones fue contemplada y la Comisión tenía conocimiento de sus funciones y la propia Asamblea Legislativa proveyó los fondos. El derecho al voto de estos electores no debió haberse dejado al arbitrio del Superintendente de la Policía.

Entendemos que estos votos de los guardias especiales deben ser tratados de manera que su voto se cuente, si no se comprueba que votaron ilegalmente, examinando los récords con que cuenta la Comisión Estatal de Elecciones para determinar que un elector estaba capacitado para votar y que no votó dos veces.

A solicitud del P.P.D. y P.S.P., examinamos la procedencia de ese dictamen.

*Primeramente,* salvo las disposiciones del estatuto que contempla a los miembros de la Policía beneficiarios del sistema de voto ausente, no existe otra disposición legal mediante la cual pueda autorizarse a los guardias especiales a votar fuera del colegio en que están inscritos. *Segundo,* aunque desconocemos los motivos para ello y la razonabilidad de esa posición, la Comisión Estatal *unánimemente,* y su Adminis-

trador, con apoyo en la ley, se negaron a establecer un mecanismo especial para que esas personas votaran de otro modo. A tales efectos, discreparon desde temprano de la decisión del Superintendente sobre la necesidad de tales nombramientos. Y *tercero*, al insistir este último, el Administrador le previno que era imprescindible que los guardias especiales fueran asignados al Colegio o Unidad Electoral en que les correspondía votar.

Con estos antecedentes fácticos, está huérfano de sostén el aserto de la Junta Revisora Electoral de que los guardias especiales fueron "inducidos" por la Comisión Estatal a votar fuera de los colegios. Todo lo contrario, la carta del Administrador General desmiente tal conclusión.

■ Desconocemos qué criterios selectivos utilizó el Superintendente de la Policía para *sua sponte* reclutar y escoger a dichos guardias especiales. Ciertamente, su designación debió corresponder a la acertada orientación de la Comisión y su Administrador de que los asignara a la unidad electoral en que figuraban inscritos. Aunque la apreciación respecto a la suficiencia de la fuerza policíaca regular para "velar por el mantenimiento del orden en cada centro de colegios de votación", a la par que atender las tareas normales de protección y seguridad, corresponde más bien al Superintendente, éste debió dejar el reclutamiento o la contratación en manos del Administrador, funcionario a quien el legislador encomendó esta tarea. Adviértase que el Poder Legislativo actuó con sensible y comprensible escrupulosidad al sacar del ámbito del Superintendente de la Policía la facultad de reclutar a ese personal, por la simple razón de ser éste visiblemente el funcionario policial de mayor rango, pero subordinado y de confianza al Primer Ejecutivo, quien, a su vez, resulta ser candidato a reelección de ese cargo.

Ahora bien, independientemente de la innegable importancia del precepto estatutario de que todo elector vote en el colegio en que está inscrito y de la cuestionable legalidad de

la actuación del Superintendente de la Policía ante la clara directriz de la Comisión sobre la cuestión electoral, no podemos abstraernos de que, de prevalecer la nulidad decretada por la Comisión, el resultado neto sería privar a estas personas de ejercer el derecho al voto, precisa e *irónicamente* por estar desempeñándose activamente en una función de vital importancia en el desenvolvimiento ordenado y seguro del evento electoral.

El derecho al sufragio, espina dorsal del cuerpo de la democracia, opera y se fortalece de aires y corrientes liberales. No se puede seriamente debatir que el desarrollo de las recientes elecciones no estuvo a la expectativa deseada ni exento de muchas de las fallas que tradicionalmente, en mayor o menor grado, agobian y caracterizan el proceso. El estrecho margen de votos entre los partidos principales —en un sistema cuya ley y estructura no estaban diseñadas para esa eventualidad y en un país cuya ciudadanía no estaba acostumbrada a ello— ha contribuido al desasosiego y malestar. La tardanza inevitable que implica la relevancia que entonces toman las irregularidades inevitables y naturales habidas en un proceso que conlleva la movilización, participación y decisión de más de un millón y medio (1,500,000) de personas, y la importancia que a cada voto potencial determinado partido político le atribuye, forman parte del medio ambiente, premisas intangibles y otros factores en que se debaten los reclamos de las partes en estos recursos. Tomamos conocimiento judicial de que en estas elecciones hubo exclusiones indebidas de electores de las listas, dobles inscripciones, errores o falta de procesamiento en las solicitudes de transferencias de precinto y otras más. Para remediar tales fallas la Comisión, antes, durante y después del proceso eleccionario, adoptó normas y trámites. A tales efectos, para salvar las exclusiones incorrectas de electores, la Comisión creó Colegios Especiales denominados "F-1" en cada precinto electoral permitiendo que éstos votaran, aunque no aparecieran en las listas. Se

superó así la falla técnica, aceptándose la presentación de la tarjeta de identificación electoral o copia de una petición de inscripción como indicativo de la idoneidad del elector. Acordó también convalidar la primera inscripción en casos de doble inscripción motivada por el sistema y autorizar la adjudicación de las papeletas electorales que demostraban haberse efectuado oportunamente la transferencia, pero que la Comisión no la procesó o lo hizo erróneamente. Y este Tribunal, en el caso del *P.S.P., P.P.D. y P.I.P.*, supra, autorizó —independientemente y en contra del lenguaje estatutario del Art. 5.036— que los funcionarios de colegios que carecían de la tarjeta de identificación electoral pudieran votar en el Colegio Electoral al que fueron asignados y en que desempeñaron sus labores, aunque no estuvieran inscritos allí.

Ese enfoque liberal de reconocer y viabilizar el derecho al voto, con sujeción a los parámetros constitucionales y estatutarios que ha manifestado la Comisión y este Tribunal, debe servir de muro de contención a las tesis del P.S.P. y del P.P.D. de que la Junta Revisora erró al invalidar el acuerdo original de la Comisión fechado 12 de noviembre, de anular automáticamente —sin mandato *expreso en la ley*— los votos de los guardias especiales que lo emitieron fuera de sus colegios. En cierta medida y última instancia, la situación es análoga a la examinada y resuelta en la decisión del *P.S.P., P.P.D. y P.I.P.* antes mencionada. Aunque técnicamente tales guardias especiales no son funcionarios de colegio, en el fondo de la cuestión se percibe el común denominador de que prestaron un servicio esencial, parecido y paralelo al de éstos y a los de la Policía Estatal y Guardia Municipal. *Deben adjudicarse tales votos, según las reglas válidas aprobadas por la Comisión.*

### III

*RECURSOS*

O-80-635, *Partido Socialista Puertorriqueño* v. *Comisión Estatal de Elecciones y su Administrador,*

*Gerineldo Barreto Pérez;* O-80-646, *Partido Popular Democrático* v. *Gerineldo Barreto Pérez, Administrador, y Comisión Estatal de Elecciones.*

La revisión O-80-635 se origina en un acuerdo adoptado por la Comisión Estatal de Elecciones en que se deniega una solicitud del Partido Socialista Puertorriqueño (P.S.P.) de que se adjudiquen a favor de Juan Mari Bras y Carlos Gallisá, candidatos por acumulación al Senado y Cámara de Representantes, respectivamente, varias papeletas en que la cruz del elector fue hecha en el encasillado contiguo a los nombres de dichos aspirantes, bajo la columna de nominación directa, según lo ilustran las papeletas que identificamos en el Apéndice de esta ponencia como *Ejemplo A,* —escala reducida— y *Ejemplo B,* —escala real— respectivamente.

El recurso O-80-646 nace de una negativa de la Comisión a una solicitud del Partido Popular Democrático (P.P.D.) de que se adjudiquen como válidos los votos emitidos por electores que hicieron una marca sobre el cuadrante que correspondía a dicho partido. Esta situación queda demostrada en los *Ejemplos C y D* del Apéndice.

La Comisión, en virtud de decisiones del Administrador, aplicó en ambos casos, con manifiesta rigurosidad, el apartado 32, titulado *Marcas Válidas,* del *Manual de Procedimientos para Funcionarios de Colegio y Coordinadores de Unidad Electoral* que en lo pertinente dispone: "[c]ualquier marca de las consideradas válidas que no fueran nombres o iniciales que apareciere puesta en los espacios en blanco de nominación abierta, o en otros espacios fuera de la columna de los partidos se tomará como por no puesta". Como consecuencia decretó nulas tales papeletas.

No conformes, tanto el P.S.P. como el P.P.D., en apelaciones separadas acudieron ante la Junta Revisora Electoral señalando, en esencia, que la Comisión erró por interpretar restrictivamente la ley en contra de la Constitución y el caso de *Aldarondo Galván* v. *J.E.E.,* 100 D.P.R. 1083 (1972).

En el caso del P.S.P., mediante votación dividida[9] la Junta sostuvo a la Comisión a base del siguiente razonamiento:

Esta disposición cubre ambas situaciones planteadas en esta petición. La marca es una marca válida, en este caso una (x) pero se han colocado *totalmente* en la columna de nominación directa o en la columna de candidatura independiente. De acuerdo con el criterio anteriormente expuesto, estas marcas se entienden como no puestas. Sin embargo, si se escribiera el nombre o las iniciales de un candidato u otra persona, *es más clara la intención del elector y en ese caso se adjudica el voto según esa intención.* Como puede apreciarse de lo anterior el voto no se declara nulo. Puede conservar su validez en cuanto a otras marcas, pero en cuanto a aquéllas fuera de las columnas de los partidos se entenderán como no puestas.

Las disposiciones de la ley electoral referente a la forma, diseño y contenido de la papeleta al igual que en lo referente al orden de candidaturas lo que persigue es establecer un método para dar estabilidad, confianza y certeza al sistema. Así, aparecerán impresos en la papeleta, primero, los nombres de los candidatos con expresión del cargo a que aspiran de aquel partido cuyo candidato a gobernador hubiese obtenido una mayoría de votos en la elección general precedente, continuará con los del partido que hubiese quedado segundo y así sucesivamente. Luego aparecen los candidatos de los partidos por petición, en el orden en que éstos hayan completado su inscripción y después *los candidatos independientes, si los hubiera.* Al final se provee en la papeleta para cada cargo electivo, espacios en blanco en donde los electores puedan escribir, si lo desean, el nombre de candidatos distintos a aquéllos cuyos nombres han sido impresos en la misma. (Columna de nominación directa "write in"). Ambas columnas en esas papeletas tienen un propósito de ley que obviamente no es la de recibir votos mediante marcas para candidatos que aparecen en la papeleta bajo la columna de su partido.

Aparenta ser la regla en la mayor parte de los Estados Unidos que el voto no se cuenta a un candidato si la marca se coloca

---

[9] Su Presidente, Sr. Roberto Schmidt Monge, disintió por estimar que se trataba de una interpretación restrictiva, invocando a *Aldarondo Galván* y aduciendo que el apartado 32 antes transcrito fue adicionado a la Regla 61 del *Reglamento Elecciones Generales 1980 sin* base legal *alguna.*

fuera del espacio provisto por la ley. Se ha sostenido la nulidad del acto del elector si pone la marca en un espacio en blanco provisto en la papeleta para que el elector anote el nombre de cualquier otro candidato que no aparece en las columnas anteriores de la papeleta.

El planteamiento sobre el defecto en el diseño de la papeleta es inmeritorio. La papeleta tiene espacio a la derecha e izquierda de los nombres de los candidatos. Hemos examinado cuidadosamente la misma y ésta tiene espacio suficiente a ambos lados del nombre de ambos candidatos para hacer la marca correspondiente. Además la ley permite que la marca válida esté debajo, sobre, al lado o encima de la propia insignia del candidato. (Escolios omitidos.) (Bastardillas nuestras.)

Respecto al caso del P.P.D., la Junta también confirmó a la Comisión reiterando:

Hemos examinado cuidadosamente las ocho (8) papeletas sometidas en evidencia por el querellante y en las mismas la intención de los votantes de votar por el Partido Popular Democrático se manifiesta claramente. En el caso de *Partido Socialista Puertorriqueño*, peticionario, caso núm. JR. 80-266, resuelto por esta Junta en 14 de noviembre de 1980, se trataba una situación similar de hechos al presente. En el mismo resolvimos, basándonos en la letra de la ley y de acuerdos adoptados por la Comisión, que marcas puestas fuera de las columnas de los partidos se entenderán como no puestas. En dicho caso sin embargo, no se nos hicieron planteamientos constitucionales como en el presente.

*No cabe duda de que la intención de los ocho (8) votantes en este caso fue votar por el Partido Popular Democrático.* Sin embargo, hicieron su marca fuera del espacio donde aparece impresa la insignia de ese partido. . . . (Bastardillas nuestras.) ([10])

---

([10]) Nuevamente el Presidente de la Junta Revisora, Sr. Roberto Schmidt Monge, disintió por los mismos fundamentos del caso de P.S.P. La Miembro Asociado Sra. Myrta Irizarry Ríos suscribió un voto concurrente consignando su discrepancia con el Miembro Asociado Sr. Benigno Dapena en cuanto a la facultad de la Junta para pasar juicio sobre planteamientos de índole constitucional. A juicio de ella, la Junta tiene esa facultad y deber.

Acudieron en revisión ante este foro, y reproducen tales argumentos.

Con fines aclaratorios, es menester dejar sentado que la decisión de *Aldarondo Galván,* supra, no es autoridad ni precedente que *automáticamente* rija la solución de estos casos. El mismo fue resuelto al amparo de una disposición estatutaria que no existe al presente y que como pauta rectora legislativa consignaba, para casos de papeletas controversiales, que en "cualquier caso de duda, deberá tenerse como eficaz el señalamiento de la papeleta de tal manera que siempre que resulte en cualquier forma *la intención del votante, aun cuando aparezca defectuosamente el señalamiento, la papeleta será válida y eficaz*". Sec. 63, Ley Núm. 79 de 25 de junio de 1919 (16 L.P.R.A. sec. 220(c) *in fine*).

Esa disposición dejó de existir. La regla de hermenéutica legada por la Asamblea Legislativa en la actualidad aparece en el Art. 1.033(b) que reza:

Las reglas que adopte la Comisión para implementar cualesquiera de los sistemas de votación que entienda convenientes, proveerán para una votación secreta y que no concedan ventajas o impongan desventajas a ningún partido político o candidato, no produzcan condiciones onerosas a ningún elector o grupo de electores. Asimismo, de utilizarse la papeleta manual, deberá garantizarse que el elector pueda votar haciendo *cualquier marca* afirmativa *dentro del espacio* donde aparezca impresa la insignia o divisa de un partido o *dentro del cuadro donde aparezca el nombre de un candidato. Cualquier marca fuera de dicho espacio o cuadro será nula y se tendrá por no puesta.* (Bastardillas nuestras.) 16 L.P.R.A. Sec. 3033(b).

Al precisar sobre los contornos de esta disposición, distinto a otros intereses apremiantes del Estado expuestos en la ley, notamos que la misma persigue el interés gubernamental *específico* —cognocible y de alta jerarquía en el desarrollo maduro de nuestra democracia— de inyectarle certeza y confianza en la fase de adjudicación al voto, evitando que se generen controversias estériles en torno *a cuál fue la verdadera*

*intención de un elector.* No es el propósito de este artículo preceptuar una medida contra el fraude. La etapa y situación cubierta es reglar y detectar fácilmente la marca hecha por un elector y a favor de cuál candidato la hizo para fines de adjudicación. A tal efecto la técnica legislativa opta por decretar nula cualquier marca *fuera* de los encasillados correspondientes a la divisa del partido o de sus candidatos en particular. Como corolario, la adjudicación de una marca dentro de esos encasillados es asunto que está fuera de toda discusión.

Ciertamente la facultad constitucional que hemos reconocido en el pasado a la Asamblea Legislativa para regular y ordenar el procedimiento electoral dentro de los parámetros fijados en nuestra Ley Fundamental, comprende la forma, manera y mecánica de cómo se deben dejar constancia, plasmar y señalar la intención y voluntad del elector. Ahora bien, nuestra misión en casos de esta naturaleza es cumplir con el mandato de ley, pero reconociendo que el legislador no puede anticipar nunca todas las posibilidades imaginables en el elenco de situaciones en que la dinámica y conducta humanas se desenvuelven. En esas instancias, nuestra misión suprema es salvar —por la preeminencia del derecho envuelto— aquellas situaciones en las cuales una interpretación literal y rigurosa plantearía graves interrogantes y objeciones de carácter constitucional. Así, cuando el texto legal habla y se configura en términos *absolutos*, requiere que hagamos un esfuerzo por evitar el choque constitucional, si bien validándolo, pero atemperándolo si posible, y se logra satisfactoriamente la armonía entre el interés gubernamental envuelto y el valor primario del sufragio.

En este sentido, resulta orientador que la propia Comisión Electoral reconoció, en el Apartado 32 correspondiente al *Manual de Procedimientos para Funcionarios de Colegios y Coordinadores de Unidad Electoral* aprobado unánimemente con anterioridad al 4 de noviembre de 1980, bajo el título de

*Criterios de Determinación,* que se considerarían válidas cualquier cruz (X), marca de cotejo (✔), punto (.), raya (—), círculo (O), o variaciones de esas marcas claramente distinguibles que reflejan la intención del elector.[11] Para la búsqueda de esa intención, dicho organismo dispuso, además, los siguientes criterios de determinación:

Cualquier marca válida que aparezca dentro de la columna de un partido en el área que corresponde a la insignia del partido, sea esta marca: debajo, sobre, al lado o encima de la propia insignia significará un voto en favor de todos los candidatos de ese partido para el precinto correspondiente, a excepción de cualquier candidato que pierda su voto porque el elector marcó otro candidato de otro partido distinto, como explicado anteriormente bajo los criterios para el voto mixto.

Para *determinar la intención del elector* cuando las marcas tocan otras columnas u otros candidatos dentro de la propia columna o de partido distinto se tendrán en cuenta los siguientes criterios:

En caso de marcas en forma de cruz (X) que pudieran tocar o pasar hasta otra columna, se tomará el punto donde se encuentran las dos rayas para determinar la intención del elector. Lo mismo ocurrirá con una marca de cotejo (✔) que toque o que pase a otra columna: Se tomará el punto donde se encuentran las dos líneas *para fijar la intención de la marca.* En el caso de marcas en forma de líneas, se tomará el punto de origen de la línea para fijar la intención de la marca (—) si ésta es claramente distinguible.

Papeletas que aparecen borradas o tachadas bajo una insignia y marcadas bajo otra insignia se considerarán "Protestadas" por doble marca.

Si lo tachado fuere el nombre de un candidato, también se protestará. Papeletas que aparecen con nombres escritos en la parte del frente o de atrás, que no sean nombres en la columna de "Nominación Directa" (write-in) *o iniciales que no sean las de los inspectores; o cualquier palabra o frase escrita, sean éstas en* favor o en contra de cualquier candidato o partido o

---

[11] El Art. 1.003 (22) define el concepto *marca* como "cualquier medio de expresión afirmativo del voto del elector". 16 L.P.R.A. sec. 3003(22).

sobre cualquier otro particular; o con cualquier tipo de dibujo, marcas o figuras de cualquier clase que no fueren las permitidas para consignar un voto también serán *"protestadas"*. (Obviamente para este propósito no se tomará en cuenta los escritos ni las firmas de los funcionarios que aparecerán en las papeletas que han sido objeto del proceso de recusación.)

*Cualquier marca de las consideradas válidas (que no fueran nombres o iniciales) que apareciere puesta en los espacios en blanco de nominación directa, o en otros espacios fuera de las columnas de los partidos se tomará como por no puesta.* (Bastardillas nuestras.)

Además de estas reglas administrativas preelectorales, que proclaman la supremacía de la sustancia sobre la forma, esto es, la intención del elector sobre el tipo de marca, advertimos que la mayoría de las Reglas de Escrutinio adoptadas por la Comisión el 19 de noviembre son amplias y liberales y tienden a plasmar, como criterio rector, que la *intención* del elector prevalezca. Igual enfoque subsiste en la *Regla Especial* adoptada el 24 de noviembre para determinar la validez de ciertas marcas hechas *fuera* de los cuadrantes o encasillados impresos de las papeletas y que a veces, por milímetros de impresión, cruzan la línea negra que con carácter principal bordea el cuadrante mayor de todas las papeletas penetrando los espacios de los candidatos o partidos.

Bajo estos acuerdos, según ilustran los *Ejemplos E y F* del Apéndice, la Comisión ha estado adjudicando papeletas a favor de los candidatos Juan Mari Bras y Carlos Gallisá, a pesar de que las marcas se hicieron fuera del cuadrante de las mismas, pero dentro de la columna vertical del P.S.P. en el espacio mayor en blanco provisto debajo del cuadrante que contiene los nombres o insignias de ambos, según refleja el Apéndice. Nótese que una aplicación literal y rigurosa del estatuto y de las normas reglamentarias originales invalidarían esas papeletas. Sin embargo la Comisión, congruente con el interés medular de la ley de validar todo voto en que la intención sea claramente manifiesta, las está adjudicando co-

rrectamente, pues el propósito del voto es claro, aunque el señalamiento o marca resulta un tanto defectuoso en términos de ubicación.

Con idéntico espíritu, mediante acuerdo del 15 de noviembre también está adjudicando papeletas en las siguientes situaciones: (1) cuando el elector usa iniciales de los partidos políticos (P.N.P., P.P.D., P.I.P. y P.S.P.); y (2) cuando el elector pone las iniciales de los candidatos a la gobernación (C.R.B., R.H.C., R.B.M. o L.L.H.), o cualquier inicial identificable con un nombre en la papeleta, entendiéndose tales iniciales o el nombre del candidato puestas en el espacio correspondiente a la insignia de un partido, como una marca afirmativa bajo dicha insignia. De igual modo acordó que el 'nombre de un candidato en la papeleta, esté o no escrito en la columna de nominación directa, *no la anula*. Estas situaciones representan ejemplos vivos en que una aplicación restrictiva podría invalidar esas papeletas. Obsérvese también, en el *Ejemplo G*, otras marcas defectuosamente ubicadas al ser insertadas en el margen izquierdo *fuera* de la papeleta o en el borde inferior o superior, que por alguna casualidad tocan o traspasan la parte interior de la papeleta, que igualmente se están adjudicando a favor del partido o candidato correspondiente.

Al evaluar nuestra conciencia judicial, merecen nuestra aprobación estos acuerdos. Salvan cualquier reparo constitucional, pues parecería que el criterio de nulidad por razón de que la marca traspase el borde por escasos centímetros, no habiendo controversia sobre la intención, sería arbitrario.

█ El mismo enfoque y resultado debe prevalecer en los casos ante nos. La medida determinante es si la marca refleja claramente la intención del elector y no el evento fortuito de que la marca fue incorrectamente ubicada. ([12]) Frente a los

---

([12]) Apoya esta conclusión el Art. 1.034 (16 L.P.R.A. sec. 3034) preceptivo de que la facultad de reglamentación de la Comisión sea ejercitada de manera que las normas sean compatibles y uniformes entre sí.

argumentos especulativos que nos propone uno de los comparecientes en el sentido de que las marcas de las papeletas envueltas son susceptibles de interpretarse como protestas, temor o subterfugio, y no como la evidente intención del elector de votar a favor de esos candidatos o partidos, sometemos la cuestión al simple examen visual de las papeletas en el Apéndice —y a la inteligencia y sentido común del lector y elector— como prueba que sostiene la razonabilidad de la conclusión de que la intención manifiesta de los electores envueltos fue votar por los candidatos del P.S.P. y P.P.D. Rechazamos, por la forma de las marcas, el señalamiento de que fueron puestas con el propósito del elector de identificarse.

La circunstancia de que en el sistema de colegio abierto, en contraste con el cerrado, no existe la oportunidad para que se impartan instrucciones generales y comunes a todos los electores de cómo votar refuerza la necesidad de esta interpretación. El evento comicial envuelve a una población que excede el millón y medio de todo tipo de personas, de las más diversas posiciones sociales y condiciones intelectuales y académicas. Bajo esa óptica, hemos de recordar la admonición constitucional de que "[n]adie será privado del derecho al voto por no saber leer o escribir . . . .", Art. VI, Sec. 4. En su correcta dimensión este postulado puede conllevar, en sus variadas manifestaciones, una prohibición a que se anule el voto porque el elector no siga instrucciones que sólo afectan de manera mínima el interés legislativo que persigue reconocer la verdadera voluntad del elector.

Al tomar esta decisión no pasamos por alto la fuerza del argumento principal del Administrador en el recurso O-80-646, en el sentido de que "[s]on precisamente las pretensiones del recurrente [P.P.D.] los que en la aplicación y de prevalecer los mismos conducirían a una violación a la igual protección de las leyes en perjuicio de los Partidos Nuevo Progresista e Independentista Puertorriqueño y en beneficio de los Partidos Popular Democrático y Socialista Puertorri-

queño". Se basa en que el diseño y contenido de la papeleta, según hemos visualmente apreciado, ". . . *tiene 2 espacios en blanco* sobre las insignias de los Partidos Popular Democrático y Socialista Puertorriqueño fuera del cuadrante pero *no tiene* dichos dos espacios sobre las Insignias del Partido Nuevo Progresista y el Partido Independentista Puertorriqueño y fuera del cuadrante". El interventor P.N.P. refina este apuntamiento señalándonos que "se le estaría concediendo una ventaja de más espacio en la papeleta a los candidatos e insignias de unos partidos sobre otros".

Al reflexionar sobre los méritos aparentes del argumento, advertimos que la lógica del razonamiento es todo lo contrario. Precisamente por no existir espacio en blanco en la parte superior del cuadrante donde están dibujadas las insignias del P.N.P. y P.I.P. —ya que contienen información impresa identificando el municipio, los distritos senatoriales y representativos, el número del precinto y la naturaleza del documento— es improbable, por no decir imposible, que electores favorecedores de esos dos partidos hayan hecho sus marcas en esa área. Desde la perspectiva vertical, únicamente quedan espacios en blanco susceptibles de marcarse sobre el área fuera del cuadrante de la papeleta en los casos del P.P.D. y P.S.P. Desde el margen izquierdo, el P.N.P. es el único que podría beneficiarse de ese espacio habiendo recibido en la Comisión, según ilustra el *Ejemplo G* del Apéndice, interpretaciones de adjudicaciones favorables. Ello no significa que goza de más espacio que los otros contendientes. Se trata meramente de características fortuitas y accidentales en la forma en que fue impresa la papeleta, y que, por la multiplicidad de situaciones, el derecho exige se evalúen y adjudiquen individualmente.

Hemos visto que estas áreas de espacios en blanco existen también a la derecha y debajo de los nombres de Juan Mari Bras y Carlos Gallisá, y motivaron la controversia sobre las marcas de las candidaturas de éstos. También originaron los

acuerdos referentes a convalidar las marcas fuera de los cuadrantes, pero en el lado izquierdo de la papeleta, con referencia a los candidatos del P.N.P. (*Ejemplos E, F y G* del Apéndice.) La interpretación brindada en igualdad de condiciones para todos los partidos evita resultados injustos y gravosos al elector.

En resumen, a base de un examen visual de las papeletas impugnadas, unido a la prevalencia del derecho de los electores sobre los partidos políticos, a la alta posición del sufragio en nuestra sociedad democrática y las normas liberales adoptadas por la Comisión para otras situaciones parecidas, es inevitable concluir que son válidas estas papeletas.

Resolvemos que *cometió error la Junta Revisora.* Deben revocarse los acuerdos de la Comisión, y en los recursos (O-80-635 y O-80-646) deben adjudicarse —por ser clara, manifiesta e incontrovertible la intención de los electores— las papeletas en controversia correspondientes al P.S.P. y P.P.D.

## IV

*RECURSOS*

> O-80-658, *Luis A. Ferré, et al. y Oreste Ramos, et al.* v. *Comisión Estatal de Elecciones y Gerineldo Barreto Pérez, Administrador;* O-80-664, *Partido Socialista Puertorriqueño* v. *Junta Revisora Electoral, et al.*

Aunque radicados y perfeccionados separadamente, ambos recursos cuestionan la juridicidad del dictamen de la Junta Revisora Electoral emitido ([13]) en torno a unas querellas suscritas por varias personas en su calidad de electores, y candidatos a las cámaras legislativas aspirantes a reelección por el P.N.P., que impugnan la legalidad y constitucionalidad de unos acuerdos adoptados por la Comisión Estatal formulados

---

([13]) La decisión se produjo con el disenso del Miembro Asociado señor Benigno Dapena.

sobre la base de que "una recusación no contestada no debe adjudicarse". Los allí peticionarios alegaron que ello violaba sus derechos constitucionales por cuanto el mismo está fundamentado en el Art. 5.034 de la Ley Electoral, que de su faz infringe el Art. II, Sec. 2 de la Constitución del E.L.A. y la Primera, Quinta y Decimocuarta Enmiendas de las Constitución de los Estados Unidos, salvo que sea interpretado de otra manera.

■ La Junta Revisora, bajo la premisa de que la controversia planteádale giraba en torno a la aplicación e implementación del referido artículo —sin entrar a discutir el ataque constitucional— ([14]) interpretó la ley en el sentido de que esa disposición permite la adjudicación de las papeletas recusadas, aun cuando no fueran contestadas, en la etapa del Escrutinio General realizada por la Comisión Estatal de Elecciones a nivel central.

El controversial Art. 5.034, según enmendado por la Ley Núm. 3 del 8 de septiembre de 1980, ([15]) reza:

Recusación de un Elector.—Todo elector o inspector que tuviere motivos fundados para creer que una persona que se presenta a votar lo hace ilegalmente, o que dicha persona ha votado ya en otro colegio electoral o precinto, podrá recusar su voto por los motivos que lo hicieren ilegal a virtud de las disposiciones de esta ley, pero dicha recusación no impedirá que dicha persona emita su voto. La papeleta de todo elector cuyo voto se recuse deberá marcarse al dorso con la palabra "Recusado", seguida de

---

([14]) La facultad constitucional de pasar juicio, interpretar e invalidar leyes es exclusiva del Poder Judicial, caracterizado como "función tradicional e ineludible de las cortes". *P.S.P.* v. *E.L.A.*, 107 D.P.R. 590, 595 (1978); *Diario de Sesiones de la Convención Constituyente*, 1961, T. 3, pág. 1639.

([15]) No pasó desapercibido el carácter controversial de esta disposición, según lo revela una lectura de las transcripciones de las vistas celebradas por las Comisiones de Gobierno de la Cámara y el Senado el 21 de agosto de 1980 (págs. 306–311). Se trasluce el criterio del Presidente de la Comisión de Gobierno del Senado de que ello no constituía una intervención o gravamen indebido, sino una regulación razonable del ejercicio al voto, según se consignó finalmente en el Informe del Senado. (Págs. 92–95.)

una breve anotación firmada por la persona o el inspector de colegio que hace la misma, exponiendo la razón de tal recusación, el número de Tarjeta de Identificación Electoral de la persona afectada, el municipio, precinto y número del colegio electoral. *Si el elector recusado niega su recusación, deberá hacerlo bajo su firma y juramento al dorso de la papeleta, pero si no la negare, su voto no se contará y será nulo.* El Administrador enviará a cada Colegio de Votación un modelo de recusación para orientar a la Junta del Colegio de Votación cómo cumplimentar una recusación. (Bastardillas nuestras.)

La Junta Revisora fundamentó su dictamen así:

El problema que se presenta es con aquellas papeletas recusadas que el elector no niega bajo juramento en el colegio de votación (Art. 5.034). Cuando el elector recusado niega la recusación bajo juramento se presume que el voto es válido y se ordena la adjudicación de dicho voto a nivel de colegio. Siendo una presunción, si posteriormente se demostrare que una papeleta recusada fue votada por una persona o elector sin derecho a votar en ella, la Comisión ordenará la anulación de su voto así como la rectificación del escrutinio. Artículo 6.003, segundo párrafo. En cambio cuando el elector no niega bajo juramento la recusación, la ley presume que la recusación es cierta, por lo que se ordena la anulación del voto a nivel de colegio.

El proceso de recusación es un mecanismo importante para salvaguardar el proceso contra inscripciones y votos fraudulentos. Es un procedimiento indispensable para la protección de la pureza del proceso electoral.

La nulidad, sin embargo, es una directriz para efectos de Junta de Colegio. No se trata de una nulidad absoluta o final en sus méritos, sino una directriz de nulidad prima facie. Se trata lo que en materia de teoría del derecho se conoce como acto anulable, pero no como un acto nulo per se o nulo *ab initio*. *Metropolitan Life Ins. Co.* v. *Hall,* 12 S.E.2d 53, 61 (1940).

A nivel de colegio de votación se puede dar el caso de una recusación viciosa por un funcionario o por un elector, sin que el recusador tenga que jurar documento alguno. Al recusado, por el contrario, se le impone un deber de contestar y jurar que no guarda proporción con la mera aseveración sin juramento del recusador. *El elector recusado puede* no querer jurar o negar la recusación por diversas razones, entre las cuales se puede en-

contrar un estado de ánimo sorprendido ante una recusación viciosa, una errónea interpretación de los tecnicismos electorales, una errónea orientación proporcionada a dicho elector por maquinarias políticas o inclusive un ánimo molesto ante una recusación viciosa.

Anular permanentemente dicha papeleta por la omisión del elector recusado de negar bajo juramento la recusación, traería como consecuencia una injusticia en perjuicio del derecho constitucional al voto.

Armonizando unas disposiciones de ley con otras en cuanto a recusación se refiere —Artículos 5.034, 6.002, 6.003, 6.004— se desprende claramente que no se adjudicará por la Junta de Colegio y quedará sujeta al análisis final que en su día y en el Escrutinio General realice la Comisión Estatal de Elecciones. (Escolios omitidos.) (Bastardillas nuestras.)

Desde el punto de vista de la hermenéutica no podemos compartir esa interpretación. Como regla general, la ley contempla dos etapas y niveles en el proceso de adjudicación de toda papeleta, a saber, la *primera*, realizada ministerialmente por los funcionarios en cada colegio electoral y la *segunda*, a nivel de Escrutinio General de la Comisión Electoral, que luego de haber recibido "la documentación de las elecciones *procederá a practicar un escrutinio general, interviniendo con las papeletas no adjudicadas* y las *protestadas* y contará o rechazará éstas, según lo que a su juicio se requiera por ley, continuando el mismo hasta su terminación". (Bastardillas nuestras.) Art. 6.008.

 Únicamente las papeletas que no son contadas a nivel de Colegio Electoral por falta de unanimidad de los inspectores, denominadas *papeletas no adjudicadas*, serán adjudicadas por la Comisión Electoral oportunamente. Art. 1.003(32). La otra es la *papeleta protestada*, la cual, según conceptualizada en el mismo precepto, es "aquella en que aparezca arrancada la insignia de algún partido; escrito un nombre, salvo que sea en la columna de candidatos no encasillados; o tachado el nombre de un candidato, o que contenga iniciales, palabras, marcas o figuras de cualquier clase que no

fueren de las permitidas para consignar el voto", o cuando reflejaren una votación doble por dos partidos contrarios. Arts. 1.003(33) y 6.004. Estas son las únicas razones válidas para negarse a adjudicar una papeleta en el colegio. Representan las papeletas que de ordinario serán adjudicadas en su momento por la Comisión Electoral en la etapa del escrutinio general. El Art. 6.008 antes citado, fortalece esta posición. En consecuencia, el estatuto y trámite *regular* no visualizan que se adjudiquen las papeletas recusadas, a menos que también sean protestadas. Aclaramos, sin embargo, que la Regla 62 del Reglamento de la Comisión Estatal de Elecciones, con fuerza de ley —con una visión correcta de la importancia y valor de todo voto— amplía este trámite al preceptuar que "[e]n todo caso en que *el número de papeletas recusadas fuere suficiente para variar el resultado de la elección,* entonces la Comisión a petición fundamentada de parte interesada deberá juzgar la validez de cada papeleta recusada de acuerdo con el fundamento de su recusación". (Bastardillas nuestras.) Así, de los autos aparece que, a tono con la decisión de que el Escrutinio General se realice papeleta por papeleta, la Comisión está cumpliendo con la regla citada y simultáneamente juzgando la validez de cada papeleta de acuerdo al Reglamento.

Ese trámite puede haber sido la razón para que la Junta Revisora malinterpretara la dinámica operacional del estatuto. Ciertamente, del trámite *regular* hay que concluir que si la intención del legislador hubiese sido posponer la adjudicación de las papeletas recusadas no contestadas hasta llegar a la Comisión Electoral —para que en la fase del escrutinio general se pasara juicio sobre ellas— las hubieran incluido expresamente en el Art. 6.002 bajo el concepto de papeletas no adjudicadas. Así no lo hizo. Resulta equivocado, pues, el fundamento aducido por dicha Junta elaborado sobre la premisa errónea de que el legislador persiguió igual trato para las papeletas recusadas *no contestadas* y las *no adjudicadas,* al

expresar claramente que dicho voto no se contará y será nulo. Nos da la impresión de que dicho foro, en su celo de que el Art. 5.034 no tuviera visos de inconstitucionalidad —tal y como lo expresa la misma opinión, y con la intención de salvar dicho obstáculo— elabora una interpretación con la cual no podemos comulgar. (16)

Ahora bien, lo expuesto no resuelve ni dispone del planteamiento sobre inconstitucionalidad. Ante la claridad y ausencia de ambigüedad de su texto —basados en las más elementales reglas de hermenéutica— resulta inevitable concluir que el propósito legislativo plasmado en el Art. 5.034 fue precisamente ése: anular automáticamente y para todos los efectos las papeletas de aquellos electores que, luego de recusados, no negaron y firmaron bajo juramento tal recusación. Es, pues, inevitable abordar el problema.

En esa tarea recordamos que toda revisión se da contra el dictamen y no sus fundamentos. Creemos, por distintos fundamentos, que la constitucionalidad del texto, aun sujeta a un estricto escrutinio judicial, puede mantenerse siempre y cuando la implementación de esa voluntad legislativa sea razonable. Veamos.

En esta etapa de la ponencia, la facultad y necesidad de que la Asamblea Legislativa reglamente todo el proceso electoral está fuera de discusión. Hemos apuntado antes intereses apremiantes y legítimos del Estado que justifican la formulación de una mecánica en ley contra el fraude por quien no es un elector calificado. De lo contrario podría vulnerarse el postulado de representación democrática confiriéndole validez a un voto doble, o total validez al sufragio de quien indebida-

---

(16) La resolución de la Junta Revisora Electoral también expresa que el Art. 5.034 está en abierto conflicto con el 6.002. Se aduce que al declararse nulo el voto del elector recusado que no contesta la recusación, la Junta de Colegio está atribuyéndose facultades que no tiene, pues el Art. 6.002 expresa que ninguna papeleta se declarará nula por la Junta de Colegio. No existe tal conflicto. La Junta Revisora parte de la premisa errada de que es la Junta de Colegio quien hace la declaración de nulidad, cuando lo cierto es que tal determinación es por voz propia de ley, de jure.

mente vota fuera de la demarcación electoral que le corresponde —precinto o municipio para las candidaturas municipales. Y, además, se haría prácticamente imposible la adjudicación pronta y la certificación de los candidatos triunfantes.

En términos generales, el plan legislativo que implementa el derecho constitucional al sufragio se sirve del sistema de inscripción de electores con la participación de los partidos políticos. Las inscripciones son parciales o generales, según el carácter limitado o amplio de la convocatoria. A través del proceso inscripcionario, toda persona que posea las calificaciones básicas de ciudadanía, edad y domicilio deberá *personalmente* inscribirse en el local correspondiente a su residencia legal, supliendo y suscribiendo bajo juramento sus circunstancias personales y otra información. Los ciudadanos naturalizados deberán acreditar tal hecho con una certificación al efecto. Art. 2.007 (16 L.P.R.A. sec. 3057). Cuando de la faz de la petición se desprende que una persona no reúne los requisitos de ley, la Comisión le dará la oportunidad de mostrar causa por la cual no deba anularse la misma. Si es elector idóneo, se le expedirá una tarjeta de identificación electoral(17) de doce (12) años de vigencia con su retrato. Arts. 2.009, 2.010 y 2.011 (16 L.P.R.A. secs. 3059, 3060 y 3061). La Comisión tiene el deber de organizar un Registro del Cuerpo Electoral, un índice general del cual oportunamente se prepararán las listas de electores con derecho a votar y mantenerlo actualizado, y además, reglamentará la forma y momento de solicitar transferencia por razón de cambio de domicilio. Arts. 2.012, 2.013 y 2.014 (16 L.P.R.A. secs. 3062, 3063 y 3064). Subsiguientemente, la Comisión preparará, por precintos, las listas electorales.

Formulado en el interés apremiante gubernamental de

---

(17) En *P.S.P., P.P.D. y P.I.P.*, supra, se discute con lujo de detalles el impacto de esta tarjeta sobre la utilización del sistema combinado de colegio abierto y cerrado.

evitar el fraude, el estatuto contempla un trámite para que, dentro de determinada fecha, se depuren las listas de peticiones de inscripción, denominado procedimiento de recusación. Persigue eliminar a los electores que no tengan las calificaciones básicas antes mencionadas o que por razones atribuibles a su persona, dichas calificaciones no correspondan al modelo legislativo trazado, tales como inexactitud o cambio de dirección, fallecimiento, incapacidad judicial, doble inscripción. La recusación en esta etapa deberá jurarse fijando la ley un trámite que puede culminar con la eliminación del elector de la lista o con la subsistencia de sólo la primera inscripción. Art. 2.023.

También, la Comisión debe mantener actualizado su Registro haciendo los cambios resultantes de los decretos de incapacidad judicial y fallecimientos, en virtud de notificaciones certificadas que a tal efecto los tribunales de justicia y los Registros Demográficos le remitan. Art. 2.026 (16 L.P.R.A. sec. 3076).

Transcurridos los términos, la persona es un elector debidamente inscrito a quien le acompaña una presunción a su favor de que es un elector calificado e idóneo.

Al elector que aparece inscrito en las listas electorales de un colegio —por toda la reglamentación previa, y por el cumplimiento de todas las exigencias y los trámites que provee la Ley Electoral para obtener una inscripción como elector y figurar en la lista del colegio a que se le asigna votar— le acompaña la presunción de que hasta ese momento ha cumplido con todas esas exigencias y requisitos de ley, y es un elector capacitado. *Alvarado* v. *J.E.E.*, 100 D.P.R. 1049, 1054 (1972).

Sin embargo, siendo de tanta importancia para la democracia que sólo voten electores legítimos, el proceso de depuración de las listas no termina ahí. Se extiende hasta la última oportunidad posible, el día de elecciones, momentos antes de que el elector vaya a depositar su papeleta contentiva de su preferencia política. Se materializa en esa etapa, hasta

donde es humanamente posible, la garantía final contra el fraude. Esta recusación el día de las elecciones se produce en virtud de una alegación de un funcionario o elector, basada en motivos fundados de que el elector no está calificado o que lo hace ilegalmente. La ley requiere que sea por escrito y que el recusado la niegue, bajo su firma y juramento. De no hacerlo, ipso jure la papeleta se declara nula y no se cuenta. Si la niega, puede votar y dicha papeleta será contada y remitida a la Comisión para su adjudicación final conforme a derecho.

■ Corolario de lo expuesto: cualquier papeleta votada que no haya sido recusada válidamente, de cumplir con los demás requisitos, es un voto de incuestionable puridad, que posteriormente no puede bajo ninguna circunstancia ser objeto de impugnación y examen. Razones prácticas tales como que no existe constancia de la identidad del elector, que se estaría vulnerando la secretividad del sufragio y que nunca podría imprimírsele finalidad a la contienda electoral lo impiden.

Con estas consideraciones, notamos que la tesis de inconstitucionalidad se elabora a base de que resulta oneroso e irrazonable exigirle a un elector —a quien le acompaña una presunción de que está calificado— que niegue bajo juramento los motivos de la recusación —bajo apercibimiento de perjurio o de perder su voto—, cuando el recusante no tiene que firmar su recusación, y se origina exclusivamente en la apreciación de "motivos fundados". La desproporción es más aparente que real. La frase "motivos fundados" no es amplia ni irrestricta, sino que conlleva en nuestro medio ambiente una precisión jurídica. Aunque el recusador no está expuesto a la sanción penal del perjurio, se expone al delito estatuido en el Art. 8.025(a).[18] Obsérvese, además, que todo funcionario

---

[18] Lee:

"Será sancionada con pena de reclusión por un término mínimo de un (1) mes y máximo de seis (6) meses, o multa mínima de cien (100) dólares

de colegio está obligado por el juramento prestado en virtud del Art. 5.021 (16 L.P.R.A. sec. 3221).

■ No les asiste, pues, la razón. Aunque el interés del Estado por diseñar una mecánica para evitar el fraude es evidente —y por ende es válido requerir del elector recusado que niegue la recusación— resulta claro que ésta no puede concebirse ni implementarse en términos desproporcionados. En este sentido, al reflexionar sobre la legalidad o no de la mecánica de recusación, somos de opinión de que es válida. Es elemental el axioma de que la ley no puede exigir cosas inútiles ni absurdas. Si a un elector lo recusan y por cualesquiera motivos no la contesta, sería ilógico sostener que aun así puede votar sin que la ley contemple unas consecuencias. Lo menos que podemos reconocer es que el negarlo bajo firma y juramento adelanta el interés predominante, pues es una norma que contiene suficiente vínculo de racionalidad y lógica, al indicar un acto mínimo afirmativo de la persona recusada, rodeando y perpetuando, mediante un trámite sencillo y rápido, la legitimidad y veracidad del acto, promoviendo la posibilidad y permitiendo que sea adjudicado el voto en la Comisión Estatal hasta donde le acompañaría la presunción de idoneidad que nació con su inscripción original. Esa presunción lógicamente no ha quedado destruida por razón de esa negativa.

Señalan los recurridos, sin embargo, que el proceso según estatuido, al no requerir que el recusante jure los fundamentos que tiene para recusar, facilita las recusaciones viciosas permitiendo la invalidación —por fundamentos totalmente falsos— de los votos de los electores debidamente calificados. La falla principal del argumento es que lo que invalidaría el

---

y máxima de quinientos (500) dólares, toda persona que:

"(a) Por medio de violencia, intimidación, abuso de autoridad, engaño o cualquier actuación ilegal, entorpeciere o impidiere, pretendiere o influyere a variar o impedir el voto de un elector capacitado, o que ofreciere o recibiere soborno u ofrecimiento económico para abstener, entorpecer, impedir, influenciar o variar ese voto." 16 L.P.R.A. sec. 3375(a).

voto en el supuesto señalado no serían los falsos fundamentos aducidos para recusar, sino la *negativa del elector a contestarlos*, y lo razonable sería pensar que mientras más infundado el fundamento de recusación, menor el reparo del elector en negarlo.

De igual modo, se nos argumenta que la negativa de un elector a contestar una recusación no necesariamente implica una aceptación de la veracidad de los fundamentos, sino que puede deberse al desconocimiento de la ley, a una indebida orientación, o inclusive a un ánimo molesto o sorprendido ante la recusación. El señalamiento no nos persuade. La posibilidad del desconocimiento de la ley o de la indebida orientación nos parece altamente improbable. La presencia en cada colegio de funcionarios de *todos* los partidos tiende a asegurar que el elector tendrá amplia oportunidad de ser correctamente advertido de sus derechos, lo solicite o no. Aún más, el *Manual de Procedimientos para Funcionarios de Colegios y Coordinadores de Unidad Electoral* aprobado para estas elecciones —que se incorpora y forma parte del Reglamento en virtud de la Regla 49— contenía en el acápite 25 una directriz administrativa dirigida a los funcionarios de colegio que requería que informaran a todo elector recusado que de no negar la recusación formulada en su contra, su voto sería anulado y no se contaría. Debemos presumir que dicha directriz fue cumplida. En cuanto al ánimo sorprendido o molesto por una recusación, nos es difícil refrendar la tesis que remite el cumplimiento de ley al estado anímico de la persona. Sujetar el trámite a la apreciación subjetiva de cada elector crearía incertidumbre, inestabilidad y caos en el proceso.

En resumen, el método de recusación impugnado intenta lograr balanceadamente objetivos cognoscibles por la Asamblea Legislativa, a saber, preservar la franquicia de electores calificados, prevenir el fraude y obtener una determinación razonablemente pronta del resultado eleccionario. El momento de emitirse el voto en las urnas es la única y final

ocasión en que la idoneidad del elector se puede cuestionar. La fórmula de nulidad impuesta de jure sobre el elector que no niega *de ninguna forma* la recusación es válida. [19]

A manera de ultílogo, en *P.P.D.* v. *Barreto Pérez*, supra, dijimos:

Al reflexionar sobre los valores jurídicos y comunitarios que inspiraron esa ley, notamos que el esquema legislativo parte de tres importantes supuestos: (1) que las normas y reglas referentes a toda contienda electoral, y la forma de contar el sufragio, deben quedar establecidas previamente, de manera que todos los candidatos y partidos políticos sepan a qué atenerse; (2) que no se introduzcan cambios posteriores que afecten adversamente tales reglas, concediendo ventajas impermisibles a unos sobre otros; y (3) que terminada la votación, se inicie rápidamente el conteo de votos, gestión que no debe detenerse ni dilatarse hasta que finalice con la certificación de los candidatos.

La importancia que reviste para la democracia y el imperio de la ley la recta observancia, en lo posible, de la regla previamente aprobada no debe subestimarse ni debilitarse.

---

[19] "La regla de la mayoría, sin embargo, no impide ajustes prácticos tendentes a proteger el trámite eleccionario de los peligros, siempre presentes, de abuso y fraude. A menos que tales ajustes se hagan, el proceso democrático puede pervertirse y la elección puede fallar en reflejar la voluntad de la mayoría del electorado. Uno de los mecanismos de protección más comunes es requerir que las recusaciones a las cualificaciones de los electores se hagan antes de que se emitan los votos, de modo que todo voto no recusado goce de absoluta finalidad. En elecciones políticas, este mecanismo envuelve listas de inscripción, que se cierran en algún momento antes del día de la elección; toda recusación se debe hacer durante ese período o en el colegio electoral. *De ahí en adelante es demasiado tarde.* Se estima que aunque el restringir el derecho a recusar pueda resultar en que se cuenten algunos votos inelegibles, esto queda superado por los peligros de permitir recusaciones indiscriminadas después de la elección. Se dice que permitir tales recusaciones invadiría la secretividad del voto, destruiría la finalidad del resultado electoral, invitaría a reclamaciones inmeritorias y dilatorias de candidatos vencidos y 'mantendría perpetuamente ante los tribunales las mismas excitaciones, rivalidades y animosidades que caracterizan la tribuna pública, y que, para la paz de la comunidad, y la seguridad y estabilidad de nuestras instituciones, deben terminar con el cierre de las urnas.'" (Bastardillas nuestras.) *Labor Board* v. *Tower Co.*, 329 U.S. 324, 331–332 (1946). (Traducción nuestra.)

A nivel constitucional representa las aspiraciones y derechos de todo un pueblo, a nivel legislativo el interés de quienes temporalmente —a veces potencialmente candidatos a reelección— ostentan la confianza del pueblo; y a nivel de la Comisión los intereses de los partidos políticos. Sin embargo, no es una norma de imperativos absolutos susceptible de aplicarse, como solución mágica, a toda situación que surja. Solo procederá en aquellos casos en que el resultado final sea justo, equitativo, balanceado y jurídicamente correcto. Nunca podrá servir de norma para conculcar derechos, menos de la naturaleza aquí envuelta.

*Se dictará la sentencia correspondiente.*

448

# APENDICE (0-80-635) EJEMPLO A

**MODELO**

Municipio de __MAYAGUEZ__

Distrito Senatorial Núm. __4__

**MODELO**

Precinto Núm. __44__

Distrito Representativo Núm. __10__

COMISION ESTATAL DE ELECCIONES
ELECCIONES GENERALES

## PAPELETA ELECTORAL

4 DE NOVIEMBRE DE 1980

| PARTIDO NUEVO PROGRESISTA | PARTIDO POPULAR DEMOCRATICO | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | PARTIDO SOCIALISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|---|
| Gobernador de Puerto Rico | Gobernador de Puerto Rico | Gobernador de Puerto Rico | Gobernador de Puerto Rico | Gobernador de Puerto Rico |
| 1 Carlos Romero Barceló | 1 Rafael Hernández Colón | 1 Rubén Berríos Martínez | 1 Luis Lausell Hernández | 1 |
| 2 Baltasar Corrada del Río | 2 José Arsenio Torres | 2 Marta Font de Calero | 2 | 2 |
| 3 Israel Roldán González | 3 Miguel A. Deynes Soto | 3 Baltasar Quiñones Elías | 3 José J. Rodríguez Yulfo | 3 |
| 4 Justo Morales Santiago | 4 Antonio J. (Tony) Faz Alzamora | 4 Arsencgol Iglesias Guzmán | 4 Luis Antonio Toro Goyco | 4 |
| 5 Armando Pérez Ortiz | 5 Esteban Rosado Báez | 5 Ismael Vargas Muñiz | 5 Diana Branchi Rosán | 5 |
| 6 José Clemente González Ortiz | 6 Benjamín Cole | 6 Eudaldo Báez Cruz | 6 Loida Figueroa Mercado | 6 |
| 7 Virginia Gaud González | 7 Eugenio Del Valle Del Valle | 7 Orlando Serrano Valle | 7 Tomás Gordals Martínez | 7 |
| 8 Joaquín González Lagos | 8 Efraín Dieckmet Quintana | 8 Manuel Canabal Lopes | 8 Alba Nydia Rivera Ramos | 8 |
| 9 Alfredo González Valentín | 9 Hiram David Cabrera | 9 Consuelo Ramos Nadal | 9 Héctor Luis Ortiz Menéndez | 9 |
| 10 Eliezer Caro Martínez | 10 Laureano Rocafort Camano | 10 Renaldo Cintrón | 10 | 10 |
| 11 Carlos R. Matos Sánchez | 11 Angel González Cuevas | 11 Breiris Quiñones Cancel | 11 | 11 |
| 12 Nelson Fernández Torres | 12 Ernesto Rafael Lamberty Sánchez | 12 Pablo López González | 12 | 12 |
| 13 Brodnas (Lolín) Ramos Quiles | 13 Carlos D. Ríos Torres | 13 Ilís Forester | 13 | 13 |
| 14 Gilberto Rivera Vélez | 14 Ernesto Torres Silva | 14 Pedro Vargas | 14 | 14 |
| 15 Jaime (Jimmy) Valentín Vélez | 15 Nelson J. Zapata Pérez | 15 Javier Muñiz Quiñones | 15 | 15 |
| 16 Luis Cruz Morales | 16 José Pérez Rodríguez | 16 Rafael Romero | 16 | 16 |
| 17 Manuel A. Faz Ruiz | 17 Eloids D. Acosta De Castelló | 17 René Cabán | 17 | 17 |
| 18 Domingo (Reinaldo) Ortiz Rodríguez | 18 Marina Pardo Ramírez | 18 Luz Roberto Nieto | 18 | 18 |
| 19 Alfredo Ocaso Pérez | 19 Evelyn Rodríguez Rivera | 19 Segismundo Lopes | 19 | 19 |

| SENADORES POR ACUMULACION | SENADORES POR ACUMULACION | SENADORES POR ACUMULACION | SENADORES POR ACUMULACION | SENADORES POR ACUMULACION |
|---|---|---|---|---|
| 1 Luis A. Ferré Aguayo | 1 Sergio A. Peña Clos | 1 Luis A. Rivera Lacourt | 1 Juan Mari Brás | X |
| 2 Nicolás Nogueras Cartagena | 2 Justo A. Méndez | 2 Justo Echevarría Figueroa | 2 | |
| 3 Miguel A. (Mickey) Miranda | 3 Víctor M. Rodríguez | 3 Héctor René Lugo Ríos | 3 | |
| 4 Edwin Ramos Yorden | 4 Miguel Hernández Agosto | 4 José J. Hernández Rivera | 4 | |
| 5 Cabazo Calero Juarbe | 5 Francisco (Paco) Aponte Pérez | 5 Luis F. Ramos Ramos | 5 | |
| 6 Efraín Santiago | 6 Velda González | 6 Armando Torres Ortiz | 6 | |

| REPRESENTANTES POR ACUMULACION | REPRESENTANTES POR ACUMULACION | REPRESENTANTES POR ACUMULACION | REPRESENTANTES POR ACUMULACION | REPRESENTANTES POR ACUMULACION |
|---|---|---|---|---|
| 1 Angel Viera Martínez | 1 Rony Jarabo | 1 Ariel Colón Prats | 1 Carlos Gallisa Babel | X |
| 2 Luis M. Ayala del Valle | 2 Luis Muñoz Arjona | 2 Filix Rodríguez Hernández | 2 | |
| 3 Charlie Rodríguez | 3 Severo Colberg | 3 Fernando Martín García | 3 | |
| 4 José Granados Navedo | 4 Luis A. Duprey | 4 Carlos Mondríguez Torres | 4 | |
| 5 Freddy Valentín Acevedo | 5 Fernando Tonos | 5 Juan José Juarbe Juarbe | 5 | |
| 6 Oswaldo Torres Velázquez | 6 José E. Arrarás | 6 Irma Rodríguez Morales | 6 | |

# EJEMPLO B

| SENADORES POR ACUMULACION | SENADOR POR ACUMULACION | SENADOR POR ACUMULACION |
|---|---|---|
| Luis Rivera Lacourt | 1 Juan Mari Bras | 1 ✕ |
| Justo Echevarría | | |
| Héctor René Lugo | | |
| José Juan Hernández | | |
| Luis Ramos Ramos | | |
| Armandito Torres | | |
| **REPRESENTANTES POR ACUMULACION** | **REPRESENTANTE POR ACUMULACION** | **REPRESENTANTE POR ACUMULACION** |
| Ariel Colón Pratts | 1 Carlos Gallisá | 1 ✕ |
| Félix F. Rodríguez (Paky) | | |
| Fernando Martín | | |
| Carlos Mondríguez | | |
| Juan José Juarbe (Guango) | | |
| Irma Rodríguez | | |

(0-80-646) EJEMPLO C

**MODELO** **MODELO**

COMISION ESTATAL DE ELECCIONES
ELECCIONES GENERALES

Municipio de __MAYAGUEZ__ X **PAPELETA ELECTORAL** Precinto Núm. ___44___

Distrito Senatorial Núm. ___4___ 4 DE NOVIEMBRE DE 1980 Distrito Representativo Núm. ___16___

| PARTIDO NUEVO PROGRESISTA | PARTIDO POPULAR DEMOCRATICO | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | PARTIDO SOCIALISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|---|
| Gobernador de Puerto Rico | Gobernador de Puerto Rico | Gobernador de Puerto Rico | Gobernador de Puerto Rico | Gobernador de Puerto Rico |
| 1 Carlos Romero Barceló | 1 Rafael Hernández Colón | 1 Rubén Berríos Martínez | 1 Luis Lausell Hernández | 1 |
| Comisionado Residente en los Estados Unidos | Comisionado Residente en los Estados Unidos | Comisionado Residente en los Estados Unidos | Comisionado Residente en los Estados Unidos | Comisionado Residente en los Estados Unidos |
| 2 Baltasar Corrada del Río | 2 José Arsenio Torres | 2 María Font de Calero | 2 | 2 |
| Senadores por el Distrito | Senadores por el Distrito | Senadores por el Distrito | Senadores por el Distrito | Senadores por el Distrito |
| 3 Israel Roldán González | 3 Miguel A. Deynes Soto | 3 Baltazar Quiñones Elías | 3 José J. Rodríguez Yulfo | 3 |
| 4 Justo Morales Santiago | 4 Antonio J. (Tony) Fas Alzamora | 4 Arsengol Iglesias Guzmán | 4 Luis Antonio Toro Goyco | 4 |
| Representantes por el Distrito | Representantes por el Distrito | Representantes por el Distrito | Representantes por el Distrito | Representantes por el Distrito |
| 5 Armando Pérez Ortiz | 5 Esteban Rosado Báez | 5 Ismael Vargas Muñiz | 5 Diana Branchi Román | 5 |
| Alcalde | Alcalde | Alcalde | Alcalde | Alcalde |
| 6 José Clemente González Ortiz | 6 Benjamín Cole | 6 Eudaldo Báez Cruz | 6 Loida Figueroa Mercado | 6 |
| Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal | Miembros de la Asamblea Municipal |
| 7 Virginia Gaud González | 7 Eugenio Del Valle Del Valle | 7 Orlando Bermeo Valle | 7 Tomas Gordils Martínez | 7 |
| 8 Joaquín González Lagos | 8 Efraín Diodonet Quintana | 8 Manuel Canabal Lopes | 8 Alba Nydia Rivera Ramos | 8 |
| 9 Alfredo González Valentín | 9 Hiram David Cabezas | 9 Consuelo Ramos Nadal | 9 Héctor Luis Ortiz Menéndez | 9 |
| 10 Ebenzer Caro Martínez | 10 Laureano Rocafort Casano | 10 Reinaldo Cintrón | 10 | 10 |
| 11 Carlos R. Matos Sánchez | 11 Angel González Cuevas | 11 Beatriz Quiñones Cancel | 11 | 11 |
| 12 Nelson Fernández Pérez | 12 Erasmo Rafael Lamberty Sanches | 12 Pablo López González | 12 | 12 |
| 13 Erodina (Lolín) Ramos Quiles | 13 Carlos D. Ríos Torres | 13 Ilís Forestier | 13 | 13 |
| 14 Gilberto Rivera Vélez | 14 Ernesto Torres Silva | 14 Pedro Vargas | 14 | 14 |
| 15 Jaime (Jimmy) Valentín Vélez | 15 Nelson J. Zapata Pérez | 15 Jenar Muñiz Quiñones | 15 | 15 |
| 16 Luis Cruz Morales | 16 José Pérez Rodríguez | 16 Rafael Romero | 16 | 16 |
| 17 Manuel A. Paz Ruiz | 17 Eloida D Acosta De Castello | 17 René Caban | 17 | 17 |
| 18 Domingo (Reinaldo) Ortiz Rodríguez | 18 Marina Parte Ramírez | 18 Luis Roberto Nieto | 18 | 18 |
| 19 Alfredo Ocasio Pérez | 19 Evelyn Rodríguez Rivera | 19 Segismundo Lopes | 19 | 19 |

| SENADORES POR ACUMULACION | SENADORES POR ACUMULACION | SENADORES POR ACUMULACION | SENADORES POR ACUMULACION | SENADORES POR ACUMULACION |
|---|---|---|---|---|
| 1 Luis A. Ferre Aguayo | 1 Sergio A. Peña Clos | 1 Luis A. Rivera Lacourt | 1 Juan Mari Bras | 1 |
| 2 Nicolas Nogueras Cartagena | 2 Justo A. Méndez | 2 Justo Echevarria Figueroa | 2 | 2 |
| 3 Miguel A. (Mickey) Miranda | 3 Victor M. Rodríguez | 3 Hector Rene Lugo Rios | 3 | 3 |
| 4 Edwin Ramos Yordan | 4 Miguel Hernández Agosto | 4 Jose J. Hernández Rivera | 4 | 4 |
| 5 Calixto Calero Juarbe | 5 Francisco (Fuco) Aponte Pérez | 5 Luis F. Ramos Ramos | 5 | 5 |
| 6 Efrain Santiago | 6 Velda González | 6 Armando Torres Ortiz | 6 | 6 |

| REPRESENTANTES POR ACUMULACION | REPRESENTANTES POR ACUMULACION | REPRESENTANTES POR ACUMULACION | REPRESENTANTES POR ACUMULACION | REPRESENTANTES POR ACUMULACION |
|---|---|---|---|---|
| 1 Angel Viera Martínez | 1 Rony Jarabo | 1 Anel Colon Pratts | 1 Carlos Gallisa Bisbal | 1 |
| 2 Luis M. Ayala del Valle | 2 Luis Muñoz Arjona | 2 Felix Rodríguez Hernandez | 2 | 2 |
| 3 Charlie Rodríguez | 3 Severo Colberg | 3 Fernando Martin Garcia | 3 | 3 |
| 4 José Granados Navedo | 4 Luis A. Duprey | 4 Carlos Mondríguez Torres | 4 | 4 |
| 5 Freddy Valentín Acevedo | 5 Fernando Tonos | 5 Juan José Juarbe Juarbe | 5 | 5 |
| 6 Osvaldo Torres Velázquez | 6 José E. Arrarás | 6 Irma Rodríguez Morales | 6 | 6 |

# EJEMPLO D

Municipio de **SAN JUAN**
Distrito Senatorial Núm. **1**
Precinto Núm. **2**
Distrito Representativo Núm. **2**

## COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
## PAPELETA ELECTORAL
### 4 DE NOVIEMBRE DE 1980

(0-80-646)

| | PARTIDO NUEVO PROGRESISTA | PARTIDO POPULAR DEMOCRATICO | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | PARTIDO SOCIALISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|---|---|
| 1 | Gobernador de Puerto Rico — Carlos Romero Barceló | Gobernador de Puerto Rico — Rafael Hernández Colón | Gobernador de Puerto Rico — Rubén Berríos Martínez | Gobernador de Puerto Rico — Luis Lausell Hernández | Gobernador de Puerto Rico |
| 2 | Comisionado Residente en los Estados Unidos — Baltasar Corrada del Río | Comisionado Residente en los Estados Unidos — José Arsenio Torres | Comisionado Residente en los Estados Unidos — Marta Font de Calero | Comisionado Residente en los Estados Unidos | Comisionado Residente en los Estados Unidos |
| 3 | Senadores por el Distrito — Oreste Ramos | Senadores por el Distrito — Cándida Martínez Benítez | Senadores por el Distrito — Margarita Ostolaza Bey | Senadores por el Distrito — José Rafael Coss Pontón | Senadores por el Distrito |
| 4 | Rolando (Rolo) Silva Iglesias | José Arnel Nazario | Isis Sánchez Longo | Pedro Baugés Chapel | |
| 5 | Representante por el Distrito — Jaime Rosario Báez | Representante por el Distrito — José Amaury Rodríguez Fragoso | Representante por el Distrito — Rafael García Rodríguez | Representante por el Distrito — Dora Pizarro Claudio | Representante por el Distrito |
| 6 | Alcalde — Hernán Padilla | Alcalde — Celeste Benítez | Alcalde — Roberto Aponte Toro | Alcalde — Lucila A. Romero | Alcalde |
| 7 | Miembros de la Asamblea Municipal — Frank Santaella | Miembros de la Asamblea Municipal — Carmen Ramos de Santiago | Miembros de la Asamblea Municipal — Luis Angel Viera Gómez | Miembros de la Asamblea Municipal — Domingo Vega Figueroa | Miembros de la Asamblea Municipal |
| 8 | Rómulo Miranda | Gilberto Oliver | Basilio Adorno Hernández | Néstor Nazario Trabal | |

Se provee esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee escrutar, fuera de los que aparecen en las columnas anteriores.
Artículo 6.011
Ley Electoral

# EJEMPLO E

**MODELO**

Municipio de __MAYAGUEZ__
Distrito Senatorial Núm. __4__

COMISION ESTATAL DE ELECCIONES
**ELECCIONES GENERALES**
## PAPELETA ELECTORAL
**4 DE NOVIEMBRE DE 1980**

**MODELO**

Precinto Núm. __44__
Distrito Representativo Núm. __10__

| PARTIDO NUEVO PROGRESISTA | PARTIDO POPULAR DEMOCRATICO | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | PARTIDO SOCIALISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|---|
| Gobernador de Puerto Rico | Gobernador de Puerto Rico | Gobernador de Puerto Rico | Gobernador de Puerto Rico | Gobernador de Puerto Rico |
| 1 Carlos Romero Barceló | 1 Rafael Hernández Colón | 1 Rubén Berrios Martínez | 1 Luis Lausell Hernández | 1 |
| 2 Baltasar Corrada del Río | 2 José Arsenio Torres | 2 Marta Font de Calero | 2 | 2 |
| 3 Israel Roldán González | 3 Miguel A. Deynes Soto | 3 Baltasar Quiñones Elías | 3 José J. Rodrigues Yulfo | |
| 4 Justo Morales Santiago | 4 Antonio J. (Tony) Faz Alzamora | 4 Armengol Iglesias Guzmán | 4 Luis Antonio Toro Goyco | 4 |
| 5 Armando Pérez Ortiz | 5 Esteban Rosado Báez | 5 Ismael Vargas Muñiz | 5 Diana Bianchi Roman | 5 |
| 6 José Clemente González Ortiz | 6 Benjamín Cole | 6 Eudaldo Báez Cruz | 6 Loida Figueroa Mercado | 6 |
| 7 Virginia Gaud González | 7 Eugenio Del Valle Del Valle | 7 Orlando Serrano Valle | 7 Tomas Gordals Martínez | 7 |
| 8 Joaquín González Lagos | 8 Efraín Dodonet Quintana | 8 Manuel Canabal Lopez | 8 Alba Nydia Rivera Ramos | 8 |
| 9 Alfredo González Valentín | 9 Hiram David Cabassa | 9 Consuelo Ramos Nadal | 9 Héctor Luis Ortiz Menéndez | 9 |
| 10 Eleazer Caro Martínez | 10 Laureano Rocafort Casano | 10 Reinaldo Cintrón | 10 | 10 |
| 11 Carlos R. Matos Sánchez | 11 Angel González Correa | 11 Beatriz Quiñones Cancel | 11 | 11 |
| 12 Nelson Fernández Peves | 12 Erasmo Rafael Lamberty Sanchez | 12 Pablo Lopez González | 12 | 12 |
| 13 Erodina (Lolita) Ramos Quiles | 13 Carlos D. Rios Torres | 13 Ilia Forestier | 13 | 13 |
| 14 Gilberto Rivera Vélez | 14 Ernesto Torres Silva | 14 Pedro Vargas | 14 | 14 |
| 15 Jesus (Jessy) Valentin Vélez | 15 Nelson J. Zapata Pérez | 15 Javier Muñiz Quiñones | 15 | 15 |
| 16 Luis Cruz Morales | 16 José Pérez Rodríguez | 16 Rafael Romero | 16 | 16 |
| 17 Manuel A. Faz Ruiz | 17 Eloida D. Acosta De Castello | 17 Zorol Cabán | 17 | 17 |
| 18 Domingo (Reinaldo) Ortiz Rodríguez | 18 Marina Parés Ramírez | 18 Luis Roberto Nieto | 18 | 18 |
| 19 Alfredo Ocaso Pérez | 19 Evelyn Rodríguez Rivera | 19 Segismundo Lopez | 19 | 19 |

| SENADORES POR ACUMULACION | SENADORES POR ACUMULACION | SENADORES POR ACUMULACION | SENADORES POR ACUMULACION | SENADORES POR ACUMULACION |
|---|---|---|---|---|
| 1 Luis A. Ferré Aguayo | 1 Sergio A. Peña Clos | 1 Luis A. Rivera Lacourt | 1 Juan Mari Bras | 1 |
| 2 Nicolás Nogueras Cartagena | 2 Justo A. Méndez | 2 Justo Echevarría Figueroa | | 2 |
| 3 Miguel A. (Mickey) Miranda | 3 Victor M. Rodrigues | 3 Héctor Rene Lugo Rios | | 3 |
| 4 Edwin Ramos Yordan | 4 Miguel Hernández Agosto | 4 Jose J. Hernandez Rivera | | 4 |
| 5 Calixto Calero Juarbe | 5 Francisco (Paco) Aponte Pérez | 5 Luis F. Ramos Ramos | | 5 |
| 6 Efraín Santiago | 6 Velda Gonzalez | 6 Armando Torres Ortiz | | 6 |

| REPRESENTANTES POR ACUMULACION | REPRESENTANTES POR ACUMULACION | REPRESENTANTES POR ACUMULACION | REPRESENTANTES POR ACUMULACION | REPRESENTANTES POR ACUMULACION |
|---|---|---|---|---|
| 1 Angel Viera Martínez | 1 Rony Jarabo | 1 Arnel Colon Prats | 1 Carlos Gallisa Bisbal | 1 |
| 2 Luis M. Ayala del Valle | 2 Luis Muñoz Arjona | 2 Félix Rodríguez Hernandez | | 2 |
| 3 Charlie Rodrigues | 3 Severo Colberg | 3 Fernando Martín García | | 3 |
| 4 José Granados Navedo | 4 Luis A. Dupery | 4 Carlos Mondriguez Torres | | 4 |
| 5 Freddy Valentin Acevedo | 5 Fernando Tonos | 5 Juan José Juarbe Juarbe | | 5 |
| 6 Oneida Torres Velázquez | 6 José E. Arraria | 6 Irma Rodríguez Morales | | 6 |

# EJEMPLO F

| SENADORES POR ACUMULACION | | SENADORES POR ACUMULACION | | SENADOR POR ACUMULACION | |
|---|---|---|---|---|---|
| Sergio A. Peña Clos | | 1 Luis Rivera Lacourt | 1 | Juan Mari Bras | |
| Francisco (Fuco) Aponte Pérez | | 2 Justo Echevarría | | | |
| Justo A. Méndez | | 3 Héctor René Lugo | | | |
| Miguel A. Hernández Agosto | | 4 José Juan Hernández | | | |
| Víctor Rodríguez | | 5 Luis Ramos Ramos | | | |
| Velda González Modestti | | 6 Armandito Torres | | | |
| **REPRESENTANTES POR ACUMULACION** | | **REPRESENTANTES POR ACUMULACION** | | **REPRESENTANTE POR ACUMULACION** | |
| Luis Muñoz Arjona | | 1 Ariel Colón Pratts | 1 | Carlos Gallisá | |
| Luis A. Duprey | | 2 Félix F. Rodríguez (Paky) | | | |
| Severo E. Colberg | | 3 Fernando Martín | | | |
| Fernando Tonos | | 4 Carlos Mondríguez | | | |
| José Enrique Arrarás | | 5 Juan José Juarbe (Guango) | | | |
| Rony Jarabo | | 6 Irma Rodríguez | | | |

# EJEMPLO G

**MODELO**

Municipio de **MAYAGUEZ**

Distrito Senatorial Núm. **4**

## COMISION ESTATAL DE ELECCIONES
## ELECCIONES GENERALES
### PAPELETA ELECTORAL
#### 4 DE NOVIEMBRE DE 1980

**MODELO**

Precinto Núm. **44**

Distrito Representativo Núm. **16**

| PARTIDO NUEVO PROGRESISTA | PARTIDO POPULAR DEMOCRATICO | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | PARTIDO SOCIALISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|---|
| | | | | Se provee esta columna en blanco para que el elector anote en ella el nombre de cualquier otro candidato que desee escoger. Pero de los que aparecen en las columnas anteriores. |
| Gobernador de Puerto Rico 1 Carlos Romero Barceló | Gobernador de Puerto Rico 1 Rafael Hernández Colón | Gobernador de Puerto Rico 1 Rubén Berríos Martínez | Gobernador de Puerto Rico 1 Luis Lausell Hernández | Gobernador de Puerto Rico 1 |
| 2 Baltasar Corrada del Río | 2 José Arsenio Torres | 2 María Font de Calero | 2 | 2 |
| 3 Ismel Rolón González | 3 Miguel A. Deynes Soto | 3 Baltasar Quiñones Elías | 3 José J. Rodríguez Yulfo | 3 |
| 4 Justo Méndez Santiago | 4 Antonio J. (Tony) Fas Alzamora | 4 Arcangel Iglesias Guzmán | 4 Luis Antonio Toro Goyco | 4 |
| 5 Armando Pérez Ortiz | 5 Esteban Rosado Báez | 5 Ismael Vargas Muñiz | 5 Diana Bianchi Román | 5 |
| 6 José Clemente González Ortiz | 6 Benjamín Cole | 6 Eudaldo Báez Cruz | 6 Loida Figueroa Mercado | 6 |
| 7 Vargas Good González | 7 Eugenio Del Valle Del Valle | 7 Orlando Serrano Valle | 7 Tomás Gordals Martínez | 7 |
| 8 Joaquín González Lopez | 8 Efraín Diodonet Quintana | 8 Manuel Canchal Lopez | 8 Alba Nydia Rivera Ramos | 8 |
| 9 Alfredo González Valentín | 9 Hiram David Cabana | 9 Consorio Ramos Nadal | 9 Héctor Luis Ortiz Menéndez | 9 |
| 10 Eliezer Caro Martínez | 10 Laureano Rocafort Casiano | 10 Reinaldo Cintrón | 10 | 10 |
| 11 Carlos R. Matos Sánchez | 11 Angel González Cuevas | 11 Beatriz Quiñones Cancel | 11 | 11 |
| 12 Nelson Fernández Pomo | 12 Erasmo Rafael Lamberty Sánchez | 12 Pablo López González | 12 | 12 |
| 13 Brunilda (Leila) Ramos Quiles | 13 Carlos D. Ríos Torres | 13 Elís Forestier | 13 | 13 |
| 14 Gilberto Rivera Vélez | 14 Ernesto Torres Silva | 14 Pedro Vargas | 14 | 14 |
| 15 Jaume (Jimmy) Valentín Vélez | 15 Nelson J. Zapata Pérez | 15 Javier Muñiz Quiñones | 15 | 15 |
| 16 Luis Cruz Morales | 16 José Pérez Rodríguez | 16 Rafael Romero | 16 | 16 |
| 17 Manuel A. Paz Ruiz | 17 Elodia D'Acosta De Castelló | 17 René Cabán | 17 | 17 |
| 18 Domingo (Reinaldo) Ortiz Rodríguez | 18 Marina Parés Ramírez | 18 Luis Roberto Nieto | 18 | 18 |
| 19 Alfredo Ocaso Pérez | 19 Evelyn Rodríguez Rivera | 19 Segismundo Lopez | 19 | 19 |
| **SENADORES POR ACUMULACION** | **SENADORES POR ACUMULACION** | **SENADORES POR ACUMULACION** | **SENADORES POR ACUMULACION** | **SENADORES POR ACUMULACION** |
| 1 Luis A. Ferré Aguayo | 1 Sergio A. Peña Clos | 1 Luis A. Rivera Larcourt | 1 Juan Mari Bras | 1 |
| 2 Nicolás Nogueras Cartagena | 2 Justo A. Méndez | 2 Justa Echeverría Figueroa | | |
| 3 Miguel A. (Mickey) Miranda | 3 Víctor M. Rodríguez | 3 Héctor René Lugo Ríos | | |
| 4 Edwin Ramos Yordán | 4 Miguel Hernández Agosto | 4 José J. Hernández Rivera | | |
| 5 Calixto Calero Juarbe | 5 Francisco (Paco) Aponte Pérez | 5 Luis F. Ramos Ramos | | |
| 6 Efraín Santiago | 6 Velda González | 6 Armando Torres Ortiz | | |
| **REPRESENTANTES POR ACUMULACION** | **REPRESENTANTES POR ACUMULACION** | **REPRESENTANTES POR ACUMULACION** | **REPRESENTANTES POR ACUMULACION** | **REPRESENTANTES POR ACUMULACION** |
| 1 Angel Viera Martínez | 1 Rony Jarabo | 1 Ariel Cobán Prats | 1 Carlos Gallisa Bisbal | 1 |
| 2 Luis M. Ayala del Valle | 2 Luis Muñoz Arjona | 2 Félix Rodríguez Hernández | | |
| 3 Charlie Rodríguez | 3 Severo Colberg | 3 Fernando Martín García | | |
| 4 José Granados Navedo | 4 Luis A. Dupuy | 4 Carlos Mondríguez Torres | | |
| 5 Freddy Valentín Acevedo | 5 Fernando Tonos | 5 Juan José Juarbe Juarbe | | |
| 6 Orlando Trujillo Valle | 6 José E. Arrarás | 6 Irma Rodríguez Morales | | |

—0—

Opinión concurrente del Juez Asociado Señor Díaz Cruz.

San Juan, Puerto Rico, a 3 de diciembre de 1980

La Comisión Estatal de Elecciones rehusó adjudicar a Juan Mari Bras y Carlos Gallisá, candidatos del recurrente Partido Socialista Puertorriqueño a senador y representante por acumulación, el voto marcado con una cruz en el encasillado contiguo a sus nombres adentrándose en la columna de candidatos independientes y la de nominación directa. Apelada la decisión a la Junta Revisora Electoral ésta en decisión dividida(¹) desestimó la apelación sobre el fundamento de que la Regla 32 del *Manual de Procedimientos para Funcionarios de Colegios y Coordinadores de Unidad Electoral* instruye tener por no puesta cualquier marca (que no fuere nombre o iniciales) que apareciere en los espacios en blanco de nominación directa, o en otros espacios fuera de las columnas de los partidos.

Ha recurrido en revisión ante nos el Partido Socialista fundado su recurso en que la interpretación restrictiva de la Ley Electoral (Núm. 4 de 20 diciembre, 1977, pág. 639 (16 L.P.R.A. sec. 3.002 y ss.)) por la Junta Revisora viola "los derechos constitucionales del elector" y que contraviene la norma de interpretación de *Aldarondo Galván* v. *J.E.E.*, 100 D.P.R. 1083 (1972).

El Administrador General de Elecciones ha comparecido en autos solicitando la desestimación del recurso y con alegato oponiéndose al mismo, por lo que expuestas y argumentadas las posiciones de las partes en contienda, el caso es propio de pronta decisión bajo la Regla 50 del Reglamento del Tribunal.

La regla que movió a la Junta Revisora a sostener la invalidez de las papeletas marcadas con una cruz fuera del cuadro asignado al candidato está inserta en la Ley Electoral

---

(¹) Disintió su Presidente, señor Schmidt Monge.

segunda oración de su Art. 1.033 (b) que dispone: ". . . Asimismo, de utilizarse la papeleta manual, deberá garantizarse que el elector pueda votar haciendo cualquier marca afirmativa dentro del espacio donde aparezca impresa la insignia o divisa de un partido o dentro del cuadro donde aparezca el nombre de un candidato. Cualquier marca fuera de dicho espacio o cuadro será nula y se tendrá por no puesta".

La interpretación literal de la disposición transcrita en su aplicación a los hechos de este caso conduciría al absurdo de derrotar la intención legislativa de viabilizar la expresión del elector, consignada en la Declaración de Propósitos (Art. 1.002 Ley) que prácticamente incorpora la garantía del sufragio en el Art. II, Sec. 2 de la Constitución de Puerto Rico, y reiterada en distintos artículos de la Ley Electoral a que nos referimos más adelante. Hay por tanto un conflicto en el mismo estatuto entre disposiciones que propician la adjudicación del voto si la lectura o examen visual de la papeleta revela la intención del elector con patente substancialidad, esto es, sin que haya que adivinarla. Como se trata de un conflicto interno en la Ley Electoral y su interpretación ha de realizarse en forma integral, [2] refiriendo unos artículos a los otros, por cuanto lo que es claro en uno de sus preceptos pueda ser tomado para explicar lo que resulte dudoso en otro (Art. 18, Código Civil), no hay que probar su validez en depurada confrontación con el precepto del Art. II, Sec. 2 de nuestra Constitución ordenando que las leyes garanticen la

---

[2] "Las leyes no han de ser interpretadas tomando aisladamente algunas de sus secciones, párrafos u oraciones, sino que deben serlo tomando en consideración todo su contexto." *Descartes, Tes.* v. *Tribl. Contrib. y Sucn. Cautiño,* 71 D.P.R. 248, 253 (1950). A todo estatuto "debe dársele una interpretación razonable; y una aplicación literal del mismo, que resulta en consecuencias absurdas, debe ser evitada siempre que se pueda dar a la ley una aplicación razonable, consistente con el propósito legislativo". *United States* v. *Katz,* 271 U.S. 354, 357 (1926), según citado en *Pueblo* v. *Mantilla,* 71 D.P.R. 36, 43–44 (1950). "Si entre dos interpretaciones una es cónsona con la validez de la ley y también tiene el efecto de armonizar dos disposiciones aparentemente en conflicto, a ella debemos atemperarnos." *Banuchi* v. *Corte,* 64 D.P.R. 112, 120 (1944).

expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto. No podemos centrar nuestra atención únicamente en el Art. 1.033 y declararlo inconstitucional porque restrinja indebidamente la expresión de la voluntad del elector. Como sostuvo este Tribunal en *Roig Commercial Bank* v. *Buscaglia, Tes.*, 74 D.P.R. 986, 997–8 (1953), "[n]uestra obligación fundamental, en estos casos, es la de imprimirle efectividad a la intención legislativa, aún hasta el punto de sustituir o eliminar judicialmente alguna frase específica estatutaria que, con diáfana claridad, haya sido incorporada a un estatuto por inadvertencia o error, hasta el punto de que esa frase derrote obviamente la intención legislativa que surja de la totalidad de la ley, ya que, en esos casos, debe prevalecer la manifiesta intención del legislador sobre la disposición literal del estatuto que esté en conflicto con esa intención". *Cf. A. Roig, Sucrs.* v. *Junta Azucarera*, 77 D.P.R. 342, 353 (1954). En los casos de contradicción interna entre disposiciones del mismo estatuto corresponde a los tribunales resolver el conflicto identificando el propósito auténtico del legislador, si el estatuto en su integridad ofrece un margen adecuado al juez para adoptar la interpretación que guarde fidelidad a la intención legislativa y evada su disolución en "consecuencias absurdas, irrazonables o no sensatas". En ese cauce interpretativo el Tribunal puede negar eficacia a una disposición de aparente literalidad si resulta antagónica e incompatible con otras disposiciones de esa misma ley que sí anuncian la indubitable intención legislativa. *Clínica Juliá* v. *Sec. de Hacienda*, 76 D.P.R. 509, 520 y ss. (1954). No es difícil llegar a esa intención en este caso, que no es otra que según ordena el Art. 5.031 sobre la forma de votar "[e]l método para marcar la papeleta será el más sencillo posible que se ajuste al diseño de la papeleta". En pos de esa intención hemos de presumir la sabiduría del legislador y su conocimiento informado del precepto constitucional sobre la franquicia electoral en el citado Art. 2 de la Carta de Dere-

chos a que se hace expresa referencia en el Art. 1.002. Se fortalece el propósito general del estatuto en favor de una adjudicación liberal de la expresión del votante a través de sus marcas en la papeleta, con la prevención de que solo podrá ser protestada "aquella [papeleta] en que aparezca arrancada la insignia de algún partido; escrito un nombre, salvo que sea en la columna de candidatos no encasillados; o tachado el nombre de un candidato, o que contenga iniciales, palabras, marcas o figuras de cualquier clase que no fueren de las permitidas para consignar el voto" (Art. 1.003, inciso 33) ; la disposición del Art. 6.002 de que "[e]n adición a las causas para protestar la papeleta, dispuestas en el artículo 1.003 de esta ley, las mismas se podrán dejar de adjudicar cuando reflejaren una votación doble por dos partidos contrarios. Estas serán las únicas razones válidas para negarse a adjudicar en el colegio[; s]i en una papeleta aparecen marcados para una misma posición más candidatos que los autorizados al elector, se anulará el voto para esa posición, pero se contará el voto a favor de los candidatos correctamente seleccionados para las demás posiciones en la papeleta".

Es afirmación contrapuesta a la sanción de nulidad del Art. 1.033(b) la contenida en el Art. 2.001 que en parte dice:

Art. 2.001—*Derechos y prerrogativas de los electores.*

A los efectos de garantizar el libre ejercicio de la franquicia electoral, así como lograr la más clara expresión de la voluntad del pueblo, declaramos como válidos y esenciales los siguientes derechos y prerrogativas:

(1) . . . . . . . .

(2) . . . . . . . .

(3) El derecho del ciudadano al voto íntegro, al voto mixto y al voto independiente bajo condiciones de igualdad en cada caso.

. . . . . . . .

(10) El derecho a la libre emisión del voto y a que éste se cuente y se adjudique *de la manera en que el elector lo emita.* [Énfasis nuestro.]

(11) La prevalencia de los derechos electorales del ciudadano sobre los derechos y prerrogativas de todos los partidos y agrupaciones políticas.

En el propio Art. 1.033 encontramos la sentencia de ineficacia del referido requisito de marcar el voto en un particular y delimitado lugar, cuando proscribe de los sistemas de votación condiciones onerosas al elector. (³) Es así como el propio estatuto se redime del cargo de endeblez constitucional por la preponderante adhesión de su articulado a la garantía de la franquicia electoral encarnada en el Art. II, Sec. 2 de nuestra Constitución.

Las cruces puestas a la derecha en la columna en blanco de nominación directa pero en el mismo encasillado donde figuran los nombres de los candidatos señores Mari Bras y Gallisá, sin que haya otro nombre por el medio, a las claras indican la intención del elector de votar por dichos candidatos. El Partido Socialista Puertorriqueño fue el único que hizo campaña intensa por televisión solicitando votos específicos para dichos candidatos por acumulación al Senado y Cámara, hecho del que por ser notorio y de conocimiento general tomamos conocimiento judicial (R. 11 Evidencia) ; (⁴) y estas marcas responden a la instrucción trasmitida en la propaganda proselitista de dicho partido.

Coincidimos con el criterio del señor Schmidt Monge, Presidente de la Junta Revisora Electoral, en su defensa del criterio liberal de interpretación que seguimos en *Aldarondo*

---

(³) Se inicia el Art. 1.033 (b) con la siguiente oración:

"(b) Las reglas que adopte la Comisión para implementar cualesquiera de los sistemas de votación que entienda convenientes, proveerán para una votación secreta y que no concedan ventajas o impongan desventajas a ningún partido político o candidato, no produzcan condiciones onerosas a ningún elector o grupo de electores."

(⁴) Los tribunales podrán tomar conocimiento judicial a iniciativa propia en la etapa apelativa de hechos que no son razonablemente objeto de controversia por ser de conocimiento general dentro de la jurisdicción territorial del tribunal.

*Galván* v. *J.E.E.*, supra, que consignó así en su opinión disidente diciendo:

[D]ebo hacer una interpretación liberal en favor de la intención del elector. Es de conocimiento público que la campaña del Partido Socialista en favor de sus candidatos a Senador y Representante por Acumulación instruía que se votara haciendo una cruz al lado del nombre de ambos candidatos. La marca que como modelo nos somete el peticionario indica que el elector colocó la marca al lado derecho, pero en la columna inmediatamente al lado del nombre que se utiliza para la nominación directa de un candidato. Entiendo que si en esa columna lo que aparece es la cruz que hace el elector indudablemente esa es la intención, pues si hubiera querido hacer una nominación directa hubiera escrito el nombre de un candidato.

El voto es la concreción en voluntad manifiesta por el elector del fundamental precepto de que el poder político del Estado Libre Asociado de Puerto Rico emana del pueblo y se ejercerá con arreglo a su voluntad. (Constitución, Art. I, Sec. 1.) Al mismo fin se dirige el Art. 2 de la Carta de Derechos en su prevención de que las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral.

Para los funcionarios y organismos electorales llamados por ley a adjudicar un voto, debe ser norma irreducible la de evaluarlo con el mayor respeto a la voluntad del elector y con el óptimo esfuerzo por salvar su intención si ésta encuentra apoyo en la inteligencia aplicada al examen de la papeleta, obviando inobservancias de índole formal que en ejercicio de entendimiento razonable no ocultan ni enredan en confusión la verdadera intención del votante.

Por su incompatibilidad con el tenor y declarado propósito de la Ley Electoral de consagrar "el derecho al sufragio universal, igual, secreto, directo y libre, a través del cual cada ciudadano puede emitir el voto con arreglo a los dictados de su

conciencia", ([5]) carece de eficacia y energía compulsiva la disposición de su Art. 1.033 (b) que bajo pena de nulidad pretende encerrar en un cuadro la proclamada garantía del más importante derecho político. Debe reconocerse y adjudicarse el voto si la manifiesta intención del elector surge a simple vista, sin contradicción, a pesar de que su marca se desvíe un tanto del diseño geométrico de la papeleta. Como dice la Ley, el voto es una expresión de conciencia libre que también debe contarse y adjudicarse libre de trabas adjetivas, innecesarias, cuando es patente la intención del votante, y no media impugnación substantiva de su condición de elector. Aun privada de coercitividad, la regla cuestionada es útil por su valor ilustrativo a los fines de facilitar y expeditar el escrutinio de la papeleta y la adjudicación del voto.

---

([5]) Art. 1.002. Declaración de Propósitos.